**The BEST FOODS, Inc.**
**v.**
**UNITED STATES.**
**C.D. 1945; Protest No. 265823-K.**

United States Customs Court,
Third Division.
Dec. 18, 1957.

6

Sullivan & Cromwell, Davis & Gilbert, Barnes, Richardson & Colburn, New York City (John F. Dooling, Jr., Joshua Levine, Joseph Schwartz, New York City, of counsel), for plaintiff.

George Cochran Doub, Asst. Atty. Gen. (Dorothy C. Bennett and Richard E. FitzGibbon, New York City, Trial Attys.), for defendant.

Before JOHNSON and DONLON, Judges.

DONLON, Judge.

Plaintiff protests the exaction of a fee, at the rate of 2 cents per pound, laid on peanuts imported April 19, 1955, and prays that the sum thus exacted be refunded. This fee was in addition to regular duty on the imported peanuts at the rate of 7 cents per pound, charged under paragraph 759 of the Tariff Act of 1930, 19 U.S.C.A. § 1001, par. 759. The suit before us has to do only with the fee. Plaintiff raises no issue as to the regular duty.

The fee in question was imposed pursuant to Presidential Proclamation No. 3084, U.S.Code Congressional and Administrative News 1955, p. 991, dated March 9, 1955, T.D. 53755. This proclamation was issued under the purported authority of section 22 of the Agricultural Adjustment Act, as amended, 7 U.S.C. § 624, 7 U.S.C.A. § 624.

Peanuts are one of the so-called basic farm crops. Production is limited, under a program established by congressional authority. In order to forestall unlimited importation of the produce of foreign growth, which might impair the domestic crop limitation program, Congress authorized certain procedures under which, by Presidential proclamation, quotas for imported basic farm commodities may be imposed. There is statutory provision also for imposition of a fee, likewise by Presidential proclamation, on basic farm produce imported from foreign countries.

Plaintiff's contention here is that Presidential Proclamation No. 3084 does not lawfully authorize the fee of 2 cents per pound that was exacted on these peanuts. Plaintiff does not contend that Presidential Proclamation No. 3084 is void in its entirety, but only so much thereof as purports to establish a fee on quota peanuts. Two chief arguments are advanced in support of plaintiff's contention.

Plaintiff's first argument is that Presidential Proclamation No. 3084, insofar as it purports to authorize imposition of a fee on quota peanuts, was not issued pursuant to the procedures which Congress prescribed. The second argument is that, even if we should find that the procedures prescribed by Congress were, in fact, complied with, nevertheless, the exacted fee on peanuts is unlawful because Congress did not confer on the President power, at the same time, *both* to limit imports by establishing a quota and to exact a fee with respect to the quota commodity, in this instance, peanuts. It is plaintiff's contention that Congress delegated to the President power *either* to fix a quota or to exact a fee, but not the power to do both.

It is not in dispute that Presidential Proclamation No. 3084 purported *both* to fix a quota for peanuts in the year ending June 30, 1955, and to exact a fee of 2 cents per pound on quota peanuts.

The official papers are in evidence. Plaintiff also offered in evidence a stipulated statement of facts, signed by counsel for both parties, to which statement several documentary exhibits are appended. Defendant agreed, both in the stipulation which was signed and by oral statement in court, that the facts set forth in the proffered statement are true and that the appended exhibits are true copies of those documents of which they purport to be copies. Defendant, however, objected to admission of the stipulated statement and appended exhibits, on the ground that in certain respects they were irrelevant, that in other respects the facts stated related to matters not within our jurisdiction, and that much (perhaps all) of the tendered documentary material was matter of public record, of which we could take judicial notice without having the documents in evidence. Decision was reserved on the offer, in order to permit the parties to brief the question of admissibility. They have done so.

We rule that the stipulated statement of facts and appended exhibits, offered by plaintiff, may be received in evidence. They are admitted and made a part of the record, marked plaintiff's exhibit 2, with particular appended documents designated for reference by consecutively lettered subheadings of exhibit 2, that is, 2–A, 2–B, etc. We find that this material is not irrelevant, as defendant argues.

It is not to be inferred that we are unaware of the limitations on our jurisdiction. We have these limitations well in mind. Clearly we may not, as defendant rightly argues, "review" Tariff Commission proceedings, in the sense of either affirming or reversing such proceedings. We may not go behind the findings of the Tariff Commission, nor may we challenge the discretion of the President in his decision based on such findings. We do not presume to do any of these things.

The purpose of plaintiff's offering, as we understand it, is to bring before the court in one handy package, for easy reference, a considerable record of public proceedings and papers, and an agreed statement of facts with regard thereto, which may throw light on the issue that is before us, namely, whether or not plaintiff is entitled to refund of the fee of 2 cents per pound which the collector exacted. We have heretofore held that this issue is properly before us. The Best Foods, Inc. v. United States, 37 Cust.Ct. 1, C.D. 1791.

If we were to overstep the bounds that delimit our jurisdiction (and we purpose not to do so), either or both of the parties may raise that issue on appeal. Receipt of the tendered exhibit into evidence does not confer on us any jurisdiction we do not have. It can not do so. The offer is accepted in its bearing on the cause of which we have jurisdiction, and for no other purpose.

A summary of the facts with respect to the controversial Presidential proclamation may serve to clarify the issue that is before us.

On June 8, 1953, the President, by his Proclamation No. 3019, issued under section 22 of the Agricultural Adjustment Act, restricted to 1,709,000 pounds the quantity of foreign peanuts which could be entered, or withdrawn from warehouse, for consumption in any quota year, such quota to become effective with the year beginning July 1, 1953. This peanut quota included all peanuts, whether shelled, not shelled, blanched, salted, prepared, or preserved (including roasted peanuts, but not including peanut butter). No fee was proclaimed on June 8, 1953, with respect to quota peanuts. Presidential Proclamation No. 3019, June 8, 1953; amended (in respects not material to this litigation) by Presidential Proclamation No. 3025, June 30, 1953; both proclamations published as T.D. 53289, U.S.Code Congressional and Administrative News 1953, pp. 932, 940.

There seems to have been no change during the quota year July 1, 1953–June 30, 1954.

Under date of November 26, 1954, the United States Tariff Commission gave public notice that it had instituted a supplemental investigation of the peanut quota, in order to determine whether there was need for an additional quantity of imported peanuts to meet the essential requirements of domestic peanut users and, if so determined, to determine also what additional quantity of imported peanuts might be permitted to be entered during the then-current quota year (the year ending June 30, 1955), without materially interfering with or rendering ineffective the peanut program of the Department of Agriculture. This notice announced that a public hearing in the supplemental peanut quota investigation would be held on January 4, 1955. This public hearing was held.

Thereafter, Presidential Proclamation No. 3084, dated March 9, 1955, was issued. T.D. 53755. This proclamation recites *inter alia* that the United States Tariff Commission "made a supplemental investigation to determine whether there is need for an additional quantity of im-

ported peanuts during the remainder of the quota year ending June 30, 1955, to meet essential requirements of domestic peanut users, and, if so, what additional quantity might be permitted to be entered during the current quota year without materially interfering with or rendering ineffective the peanut program" of the Department of Agriculture. The proclamation further recites that the Tariff Commission submitted to the President "a report of its findings and recommendation made in connection with the said supplemental investigation." On the basis of this supplemental investigation and report, the President found (and stated his finding) that changed circumstances "require the modification of the existing quota restrictions" so as to permit an additional quantity of foreign peanuts to be entered, or withdrawn from warehouse, for consumption during the remainder of the quota period ending June 30, 1955, "subject to the fee hereinafter proclaimed * * *." Following these recitals and findings (and others not bearing on the issue before us), the President proclaimed that his June 8, 1953, proclamation (as amended June 30, 1953) "is hereby modified" to permit 51 million pounds of peanuts to be entered, or withdrawn from warehouse, for consumption "during the remainder of the 12-month period beginning July 1, 1954, * * * subject to a fee of 2 cents per pound but not more than 50 per centum ad valorem: *Provided*, That the said fee shall be in addition to any other duties imposed on the importation of such peanuts."

As previously observed, we do not have jurisdiction to review either the President's findings of fact, or his discretion, or the proceedings of the Tariff Commission. We are not, however, without jurisdiction to determine whether the "fee," which the collector has exacted of plaintiff, was lawfully exacted. We have jurisdiction, and in a proper case are required to exercise it, to determine whether taxation on imported merchandise, asserted either under the purported authority of a statute or of a Presidential proclamation, is lawfully exacted.

Presidential Proclamation No. 3084 was effective when these peanuts were entered. That is conceded. It is also conceded that these are such peanuts as the proclamation embraced.

Proclamation No. 3084 purported, in clear language, to *modify* the previous peanut quota proclamation. The President himself proclaimed his new action as such modification. It is not in dispute that the previous peanut proclamation imposed only a quota and that it did not also impose a fee on quota peanuts.

Statutory authority for modification of commodity proclamations is found in section 22(d) of the Agricultural Adjustment Act. Indeed, while Proclamation No. 3084 recites section 22, without limitation, as authority for the original peanut quota proclamation of June 8, 1953 (No. 3019), section 22(d) is cited in Proclamation No. 3084 as authority for the supplemental investigation that was made by the Tariff Commission, statutory preliminary to its report to the President of findings and recommendations relative to *modification* of the existing peanut quota.

Section 22(d) spells out the power Congress conferred on the President to "modify" his prior quota action. We set it out in full text.

> "(d) After investigation, report, finding, and declaration in the manner provided in the case of a proclamation issued pursuant to subsection (b) of this section, *any proclamation or provision of such proclamation* may be suspended or terminated by the President whenever he finds and proclaims that the circumstances requiring the proclamation or provision thereof no longer exist or *may be modified by the President whenever he finds and proclaims that changed circumstances require such modification to carry out the purposes of this section*" [Emphasis supplied.]

Plaintiff urges that the "investigation" contemplated by Congress in section 22 (d), as the prelude to modification, is not such a supplemental investigation as the Tariff Commission here instituted, but that it is the more elaborate procedure detailed in section 22(a) which is required before modification under section 22(d) may be effective. The procedure under section 22(a) is initiated by the Secretary of Agriculture, passes then to the President, from the President to the Tariff Commission, and back from the Tariff Commission to the President. There is, however, a long history of supplemental investigations that appear to assume continuing investigative authority in the Tariff Commission, once the original section 22(a) procedure has eventuated in a proclamation. Such supplemental investigations have been the basis of supplemental reports to the President of findings and recommendations for suspension, termination, or modification of an existing proclamation.

Such supplemental investigation by the Tariff Commission is not the procedure prescribed by Congress as prerequisite to the initial proclamation of commodity fees and quotas. It is, however, the condition prescribed by Congress as prerequisite to such limited Presidential action as seeks only to suspend, terminate, or modify quotas and fees, previously proclaimed. Congress has delegated to the President, under section 22(d), the power to *suspend* a proclamation or a provision thereof. Congress has delegated to the President, under section 22 (d), the power to *terminate* a proclamation or a provision thereof. Congress has also delegated to the President, under section 22(d), the power to *modify* a proclamation or a provision thereof.

The President, in his Proclamation No. 3084, did not suspend or terminate his previous proclamation as to peanuts, or any provision of it. He did modify that proclamation. Hence, it is the congressional delegation of power to *modify* a previous proclamation, on which this litigation turns.

By section 22(b), the President is empowered, by proclamation and pursuant to the procedure laid down by Congress in section 22(a), to impose a fee or a quota. In Proclamation No. 3019, he proclaimed imposition of a quota for peanuts, but he did not then proclaim the imposition of a fee on the quota peanuts. Whether or not he might then have done both, we are not called upon to decide. He imposed only a quota. Thus, the question whether he might, in Proclamation No. 3019, both have imposed a quota and a fee, is not before us in this action.

It is Proclamation No. 3019 which the President modified by his Proclamation No. 3084. It is Proclamation No. 3084 which purports to impose the fee that was exacted of plaintiff. The issue is whether delegation of power, pursuant to a prescribed procedure, to *modify* what has previously been proclaimed, that is, a quota on peanuts, delegates power not only to modify the previously proclaimed quota but also to proclaim a new fee that had not previously been proclaimed.

Whether this fee on imported peanuts is a tax, or its imposition an act in the regulation of foreign commerce, matters not for purposes of our decision. The power to tax and the power to regulate foreign commerce are constitutional powers of Congress. They are legislative powers, not powers of the Executive.

It has been held that Congress may constitutionally delegate to the President certain of its powers, provided the terms and limits of the delegation of authority are prescribed by Congress. The powers which may be so delegated include the power of Congress to raise and lower duties. Such delegation is not unconstitutional. J. W. Hampton, Jr., & Company v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624.

[5] Powers which are not incident to the Presidential office, but are delegated to the President by Congress, must be exercised in conformity with the statutory terms of delegation. United States

v. Guy W. Capps, Inc., 4 Cir., 204 F.2d 655, affirmed on other grounds 348 U.S. 296, 75 S.Ct. 326, 99 L.Ed. 329.

Congress is required to prescribe the standards which are to guide or limit the President when he acts under the delegation of legislative power. Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446.

The verb "modify" is defined in Webster's New International Dictionary, second edition, as follows:

> **modify** * * * 2. To reduce in extent or degree; to moderate; qualify; lower; as, to *modify* heat, pain, punishment. * * * 4. To change somewhat the form or qualities of; to alter somewhat; as, to *modify* the terms of a contract. * * *

Of the other six definitions of "modify" in this dictionary, one is said to be obsolete and the remaining five are special meanings not pertinent here. It is pertinent that the verb "modify," both by derivation and dictionary meaning, connotes a limitation, not an extension, of that which is modified. It is pertinent, also, that it connotes, not a major change, but an alteration only in the thing modified.

What is and is not comprehended within the purview of modification, has been judicially construed.

Construing an application to the Civil Aeronautics Board for certain routes for air transportation, as detailed in the application, "or such modification of such routes as the Board may find public convenience and necessity require," the Circuit Court of Appeals for the District of Columbia held that, under terms of the application as filed, the board lacked authority to certify new routes that were neither those applied for nor a modification thereof. State Airlines, Inc. v. Civil Aeronautics Board, 84 U.S.App.D.C. 374, 174 F.2d 510.

The Supreme Court (Civil Aeronautics Board v. State Airlines, Inc., 338 U.S. 572, 70 S.Ct. 379, 94 L.Ed. 353) reversed the circuit court, but not on the ground that the routes certified were, in fact, a modification of the routes for which application was made. Rather, the high Court, by a majority of the justices, found that the statutory delegation of authority by Congress to the board did not restrict its power of certification to the routes applied for or a modification thereof, but conferred broad authority to certify routes "in the area" of the routes applied for. Sharply dissenting, Justices Reed and Frankfurter found no such broad delegation of power by Congress to the board, as that construed by the Court majority, and emphasized that careful compliance with the requirements laid down by Congress is necessary "to protect the public from administrative absolutism." 338 U.S. at page 584, 70 S.Ct. at page 385.

Under the circumstances of the Civil Aeronautics Board case, the following language from the circuit court opinion (174 F.2d at pages 514, 515) is relevant to our problem here. For it is the fact here, as the Supreme Court found it was not the fact in that case, that modification is the power, here in issue, which was delegated by Congress to the President.

> "* * * Such a claim [i. e., that the routes certified were mere modification of the routes applied for] seems to us to be a distortion of reality and a totally unreasonable, capricious, and arbitrary interpretation of the word 'modification.' To be sure, the word 'modification' normally connotes change or altering, but such change or altering must not be great and must not result in so transforming the original thing to be modified as to make of it something entirely new and different in substance. Volume VI of The Oxford English Dictionary (1933 Edition) defines 'modification' as 'the action of limiting, qualifying, or "toning down" (a statement, etc.); a limitation, restriction, or qualification.' * * *
>
> * * * * * *
>
> "To be sure, the decision of what is or is not a modification of a given

set of proposed routes is one which resolves itself in a fundamental question of fact and we recognize that it is not the function of this court to find fact or to substitute its judgment for that of the administrative tribunal on pure questions of fact concerning which opinions may reasonably differ. However, that is not this situation. We here rule, on the facts presented and uncontroverted, that no reasonable mind could conclude that the routes awarded in this case to Piedmont were merely a modification of the routes proposed by it. The implied finding by the Board that Piedmont was an applicant for the routes awarded lacks the support of any evidence, substantial or otherwise. In ruling thus, we have not said, and we do not wish to be understood as ruling, that the Board may not take advantage of a 'catch-all clause' in an application by granting routes which represent slight deviations from those proposed. * * *"

The Circuit Court of Appeals, in the State Airlines, Inc. case, supra, cited Linn v. Linn, 242 Ala. 688, 8 So.2d 187. Rule 62 of the Alabama Equity Practice, Code 1940, Tit. 7 Appendix permitted the judge, having jurisdiction of a divorce action, to "modify" the divorce decree. The court held that:

> "* * * Modify ordinarily is not used in the sense of completely setting aside the thing to be modified, but to limit, qualify or moderate." 8 So.2d at page 188.

What did Congress intend when it used the word "modify" as one of the powers it delegated to the President? What is the power so delegated?

Power "(A) To enter into foreign trade agreements * * *" and "(B) To proclaim such modifications of existing duties and other import restrictions * * *," is delegated to the President by Congress. Section 350(a), Tariff Act of 1930, as amended, 69 Stat. 162 (1955), 19 U.S.C. § 1351 (Supp.1956), 19 U.S.C.A. § 1351.

In Abercrombie & Fitch Co. v. United States, 9 Cust.Ct. 336, C.D. 709 (1942), we held that the power delegated in section 350(a), supra, is a limited authority to *modify* existing rates of duty on existing classifications under the Tariff Act of 1930.

In Atlanta Trading Corp. v. United States, 42 C.C.P.A., Customs, 90, C.A.D. 577 (1954), our appeals court held that a provision of the exclusive trade agreement with Cuba did not constitute a reclassification of merchandise by the President, but only a "modification of existing duties, which action is authorized by section 350(a) of the Tariff Act of 1930." (P. 94.)

In Westinghouse Electric International Co. v. United States, 28 Cust.Ct. 209, C.D. 1411 (1952), we denied claim to classification under a "modification" by the President, effected through proclamation of provisions of the General Agreement on Tariffs and Trade, T.D. 51802, and held that the delegation by Congress of power to proclaim *modification* of existing duties and other import restrictions did not embrace the power to reclassify merchandise, citing the Abercrombie & Fitch case, supra.

So far as the peanut quota is concerned, the action proclaimed clearly fits the dictionary and judicially contrived meanings of modification. The previous limitation on imported peanuts was altered somewhat. It was eased. That is *modification.*

A fee was also imposed. This is a new burden. Was this a *modification* of the previous peanut quota proclamation, within the intent of Congress in delegating to the President power to *modify* his previous proclamation? Nothing in the record persuades us that it is.

Defendant appears to argue that if this fee was not imposed pursuant to the congressional delegation of authority to *modify* a previous proclamation in section 22(d), then it was imposed pursuant to the congressional delegation of authority to proclaim a fee in section 22(b). In our opinion, the record does

not support this view. The procedure taken was not the procedure under section 22(a), prescribed in the statute as the procedure prerequisite to exercise of the power delegated by Congress to initiate, by proclamation, a quota or a fee.

The views expressed by members of the Commission, during the course of the hearing, as to what they might or might not do under the notice given, do not preclude judicial ruling as to what their delegated powers are. Such views, nonetheless, throw light on what the Commission intended to do. It is clear that the Commission believed it had given notice preliminary to findings and recommendations for modification, under section 22 (d), of a quantitative quota. It is clear also that, in instituting the supplemental peanut investigation and giving notice of hearing, the Commission had not intended to initiate the procedure that is prescribed in section 22(b). The record makes these facts clear.

The procedure taken was that prescribed for modification of the previous *quota* proclamation. The Presidential proclamation, in precise language, and the opening statement at the public hearing before the Tariff Commission, so state. The notice of supplemental investigation, dated November 26, 1954, referred to the need for additional imports of peanuts. No mention was made of a fee.

The recommendation to the President by a majority of the Commission was to permit entry of foreign peanuts, shelled, blanched, salted, prepared, or preserved (including roasted peanuts, but not including peanuts, not shelled, or peanut butter) of certain sizes, subject to a fee of 2 cents per pound on the first 48 million pounds and a fee of 4 cents per pound on all such foreign peanuts in excess of 48 million pounds. That is to say, the majority recommended suspension of the quantitative quota on certain types of peanuts, and the imposition of a fee.

Two of the Commissioners filed a minority report, in which they recommended a supplementary quota of 60 million pounds of peanuts (shelled basis) without fee (other than regular duty) and without size limitation.

The President, in his Proclamation No. 3084, adhered to neither recommendation. He proclaimed a supplementary peanut quota of 51 million pounds, with certain size limitations, and also imposed a fee at the rate of 2 cents per pound.

We do not review the findings either of the Commission or of the President. We do not review the Presidential discretionary determination of action to be taken. We review only the issue as to whether the action taken, pursuant to a certain procedure, is action within the statutory delegation of legislative authority to be exercised pursuant to that procedure.

There is no delegation of authority with respect to *imposing* a fee, save the authority under section 22(b), following the section 22(a) procedure. In our opinion, exercise of authority to impose a fee calls for section 22(a) procedure. That is not the procedure which the record before us discloses.

The investigation that was initiated and the notice of hearing that was issued both related only to quantitative limitation on the importation of peanuts. Neither comprehended consideration of a fee to be newly imposed. Proclamation of matter not included within the scope of an investigation prerequisite to the proclamation is illegal. Carl Zeiss, Inc. v. United States, 76 F.2d 412, 23 C.C. P.A., Customs, 7.

The basis of our decision makes it unnecessary for us to decide several issues that have been ably and earnestly argued by counsel. For instance, it is not relevant to the decision of this action whether or not, under an appropriate procedure, the President might have proclaimed both a peanut quota and a fee on peanuts; nor whether, if both had been initially proclaimed, he might have modified both, or either. Holding, as we do, that the procedure shown in the record was that prescribed by Congress under section 22(d) as appropriate for modification of the peanut quota pre-

viously proclaimed, and that the new imposition of a fee, where none previously was proclaimed, is not mere modification of the previous peanut quota proclamation, we find the fee was unlawfully exacted of plaintiff.

The minutes of the hearing before the Tariff Commission reflect conflicting views and arguments as to whether the Commission could, under section 22, recommend both a quota and a fee. It is not necessary to our decision to recount these differences.

However, we perhaps ought not to pass over what may be an inconsistency in the views of the Commission itself as to what its powers were in the instant proceeding. At the outset, it seemed that the Commission held the view that, under the supplemental investigation as it was instituted and the notice of "the very carefully worded announcement of the hearing," the jurisdiction of the Commission *in the proceeding* was limited to quantitative matters.

Later in the hearing, discussion ranged over the broader aspect of Commission jurisdiction under section 22, without particular reference to section 22(d), or the scope of the supplemental investigation, or the notice of hearing.

This seeming difference in views as to basic jurisdiction is, as we have observed, an issue we do not need to decide.

For the reasons stated, the protest is sustained. Judgment will be rendered for the plaintiff.