**No. 62865.**—The Best Foods, Inc. *v.* United States, protest 265823–K (New York).

DONLON, Judge: This case has been before the third division several times. On June 26, 1956, we denied defendant's motion to dismiss the protest. 37 Cust. Ct. 1, C.D. 1791. On December 18, 1957, our decision after trial sustained the protest. 39 Cust. Ct. 305, C.D. 1945. On March 18, 1958, we granted defendant's motion for a rehearing. 40 Cust. Ct. 494, Abstract 61720. On May 19, 1958, counsel argued orally on rehearing.

The facts are set forth in our opinion in *idem*, 39 Cust. Ct. 305, C.D. 1945. It is not necessary here to repeat the facts. Nor is it necessary here to restate what was stated in that opinion, which we support and to which this opinion is supplemental. We proceed to consider the grounds argued by defendant on rehearing in support of his plea for judgment dismissing the protest.

These arguments may be briefly summarized. They are, *first*, that the court has too narrowly construed the authority which Congress granted to the President in section 22 of the Agricultural Adjustment Act to "modify" his prior proclamation, under the same section, of a quota on imported peanuts, contending that the power to modify a prior quota proclamation includes the power newly to impose a "fee," or special duty, on quota peanuts; and, *second*, that an importer of quota peanuts is without standing to raise the issue that the fee which the collector exacted on importation of quota peanuts was an unlawful exaction.

It is well established that, in interpreting statutory language, it is the duty of judges to seek out and apply the legislative intent. There are a great many cases in which many courts have construed "modify" or "modification" in a particular context. Much has been written in judicial opinions which spelled out the legislative intention in the context of the language being construed. It is unnecessary, as well as unprofitable, for us extensively to discuss the variety of such decisions. They differ, as the facts differ.

However, this much is plain. None of the decisions cited to us or which our own research disclosed, either when writing our previous opinion or after rehearing, goes so far as to hold that, within the congressional power granted to the Executive to modify a previously proclaimed quota according to a prescribed procedure, there is included the power also to *impose* a new fee on the quota commodity where previously there was no fee, and where Congress has prescribed a quite different procedure for the imposition of a fee. In our opinion, none of the cases defendant cites comes even close in analogy to such a broad interpretation of "modify," as Congress used that word in section 22(d) of the Agricultural Adjustment Act (cited in our principal opinion, 39 Cust. Ct. 305, C.D. 1945). It is section 22, and only section 22, which we are called upon to construe.

As we pointed out in C.D. 1945, Congress granted to the President, in section 22 of the Agricultural Adjustment Act, two different authorities which he was to exercise relative to commodity quotas or commodity fees. It prescribed separately, as to each of the authorities so conferred, the particular procedure by which he was to exercise *that* power. These procedures are different. One, the authority that is spelled out in section 22(b), is the power to *impose* by proclamation a fee or a quota. (We pass, for later attention, whether the disjunctive, as here used by Congress, is in effect the conjunctive, as defendant asserts that it is.) The other authority is conferred, not in section 22(b), but in section 22(d). That is the power to suspend or terminate a previous proclamation imposing a quota or fee, or to *modify it* (i.e., the prior quota or prior fee proclamation, as the case may be) "whenever he [the President] finds and proclaims that changed circumstances require such modification to carry out the purposes of this section."

Nothing in the cases which defendant cites persuades us that Congress intended to confer on the President, in section 22(d), the power to *impose* either a quota or a fee. That is the power Congress granted to him, by express language, in section 22(b). The method prescribed by which he was to exercise the power of imposing a quota or a fee is a different method, and somewhat more formal, than the method Congress prescribed for exercise of the section 22(d) power to *modify* a quota or fee previously proclaimed. If Congress had intended that the President might *impose* a quota or a fee under the pretext of modification, and using the simpler procedure which Congress prescribed for modification of an existing quota or an existing fee, the language Congress used to express this intention seems curiously inept. However, we find nothing vague about the statutory language in this respect. There is no need, in our opinion, to infer that Congress meant something it did not say. What it said is clear. A fee or a quota might be *imposed* under section 22(b), using the method prescribed by Congress for exercise of the authority to impose. An existing fee or an existing quota might

be *modified* under section 22(d), using the method prescribed by Congress for exercise of the authority to modify.

We rule against the construction for which defendant argues. It lacks support in the authorities. Moreover, it reduces to unmeaningful ambiguity the clear statutory separation stated by Congress in the separate subsections of section 22, as to the two different authorities conferred on the Executive by that section, namely, authority to *impose* under section 22(b) and authority to *modify* under section 22(d).

It is not for courts to make the law. As earlier observed, our duty is to ascertain what Congress intended, and to apply that intention to the facts before us in a particular case. Here, the congressional intention, both as to initial imposition and as to subsequent modification of what previously had been lawfully imposed, is clear.

Defendant's second argument on the rehearing is that, since plaintiff has imported peanuts under the modified quota which was proclaimed by the President on March 9, 1955, it may not challenge the legality of the fee exacted by the collector under purported authority of that same proclamation. The basis of this argument, as stated in defendant's brief, is that one who has accepted benefits of an unconstitutional law may not be heard to object to the burden imposed by that same unconstitutional law.

It seems to us there is little here to argue about. It is a well-established principle of law that one cannot be heard to attack the constitutionality of a statute or act which he has invoked and relied on, unless the provision that is constitutional is severable from the provision that is unconstitutional. That is to say, courts will not pass upon the issue of constitutionality at the instance of one who has availed himself of the benefits of what he attacks as unconstitutional, unless the constitutionally defective part can be separated from what is not unconstitutional.

The only customs case defendant cites is *George G. Wislar* v. *United States*, 26 C.C.P.A. (Customs) 138, C.A.D. 7. The facts are summarized in defendant's brief (p. 20) as follows:

* * * the importer claimed a rate of duty under a Trade Agreement authorized by the Trade Agreement Act of 1934 (Section 350 of the Tariff Act of 1930, as amended) and at the same time claimed that the power given the President to suspend rates of duty, made pursuant to Trade Agreements, as to countries discriminating against the United States was *unconstitutional* as an improper delegation of authority. [Emphasis supplied.]

The views of the appeals court in the *Wislar* case are shown in an excerpt from the opinion, as quoted in defendant's brief (p. 20):

As to appellants' contention to the effect that the generalization clause operated, by reason of the agreement with Sweden, to repeal the 77½ cents per dozen rate on files, it seems sufficient to say that no such theory could be sustained except by holding the proviso separable from the first part of the clause and *unconstitutional*, while at the same time declaring the validity of the first portion. In our opinion, this may not be done, and since a holding that the entire clause, or the entire act, is *unconstitutional* would utterly destroy appellants' case, we are not called upon to consider that question. [Emphasis supplied.]

Neither in defendant's brief, nor in oral argument on rehearing, has defendant suggested how we are to bridge the gap between the facts in the cited cases, having to do with the defect of unconstitutionality, and the facts here presented where there is no such defect. Here, there is no slightest suggestion that the Executive action under consideration is tainted with unconstitutionality. Indeed, it seems unlikely that anyone would now seriously assert that the authority for the President to proclaim a modification of the previously proclaimed peanut quota was an unconstitutionally delegated legislative authority, as was asserted in the

*Wislar* case. There is here no suggestion that Congress lacked constitutionally the power to delegate these authorities to the President, or that it failed properly to safeguard its grant of authorities, that is, by prescribing the methods by which the President was to exercise the powers and the limits of the authorities granted. On any usual constitutional ground that comes to mind, there is no *constitutional* issue here.

If defendant's research has disclosed cases in support of his argument, in which attack was on the legality of administrative action and not on constitutionality, the brief does not refer us to such cases. There is, of course, a wide difference between what is unconstitutional and what is merely unlawful.

What is unconstitutional is void. It does not exist. Therefore, in order to salvage anything from an unconstitutional act, it must be clearly established that there is something constitutional which may be severed, that is, which is not void.

Here, the action of the President is clearly not within the constitutional grant of powers to the Executive. The Constitution expressly confers on Congress all authority with respect to the regulation of foreign commerce. When Congress, acting constitutionally, has granted to the executive branch of Government certain specified and limited powers to act with respect to what Congress alone has authority to do, the constitutional issue does not arise in connection with subsequent Executive action under the statute. What does arise, is the question whether the Executive action is defective in any respect as not falling within the statutory grant.

An importer has, of course, no inherent right to sue the Government for correction of any wrong he thinks the Government has done to him. The right to sue, where it exists, was conferred on him by Congress. Plaintiff is here as the importer of certain peanuts (importers being expressly named in section 514 of the Tariff Act of 1930), protesting a decision of the collector, not in its entirety but only in part. Plaintiff does not protest the assessment of regular duties, as we pointed out in our prior decision. Plaintiff does ask the court, the constitutionality of the law under which the Executive has proceeded not being in question, to inquire judicially into the correctness of the Executive action exacting a fee under the purported authority of section 22 of the Agricultural Adjustment Act.

This is the principle laid down in *Kleberg & Co. (Inc.)* v. *United States*, 21 C.C.P.A. (Customs) 110, where (at p. 115) the appeals court said:

It is equally well established by the authorities that if the Secretary of the Treasury has proceeded in the method prescribed by the Congress, we may not judicially inquire into the correctness of his conclusions. *The constitutionality of the law under which he proceeds having been once determined, then the judicial power extends only to a correction of his failure to proceed according to and within the law.* [Emphasis supplied.]

In *United States* v. *Sears, Roebuck & Co.*, 20 C.C.P.A. (Customs) 295, our appeals court said (pp. 304, 305):

We have hereinbefore held that no legislative power is delegated by said section 336. We are unable to understand upon what theory the lower court holds that in carrying out the provisions of said section 336 the President acts in a judicial capacity. Under our tariff laws it is the duty of the collector to classify all merchandise for the assessment of duty, but we would scarcely suppose that the lower court would hold that in so doing the collector acts in a judicial capacity. His action is subject to judicial review, but such review is of an administrative act, not a judicial one. Likewise, the acts of the President in performing the duties imposed upon him by said section 336 are administrative, not judicial; and, as hereinbefore stated, judicial review of such acts may be had for the purpose of determining whether he has exceeded the powers delegated to him.

We find that in issuing the proclamation here in question the *President did not exceed the authority conferred upon him* by the provisions of said section 336 of the Tariff Act of 1930, and that the merchandise herein involved is properly dutiable at the rates named in said proclamation. [Emphasis supplied.]

That the President's proclamation was an administrative act and not legislative, is likewise supported in the customs case of *Field* v. *Clark*, 143 U.S. 649.

Being an administrative act, it is our duty, on protest duly filed under section 514, to consider whether or not the administrative act was in excess of the authority conferred on the Executive by Congress. This plaintiff is in no different position, in this respect, than are the many importers who regularly protest part but not all of the decisions in particular liquidations. To hold that they may not protest one administrative act unless they protest all of the acts related to a liquidation, would nullify for many importers the clear right Congress has given them, to have a judicial review for the purpose of determining whether the Executive has, in a particular case and with respect to a particular act, exceeded the powers conferred by Congress.

We had supposed, until the rehearing, that defendant had tongue in cheek when it argued that plaintiff had no standing to protest the fee because it imported the peanuts on which the fee was assessed. In oral argument, on rehearing, defendant affirmed and amplified its position in this respect. The following statement by defendant's counsel to the court indicates awareness that defendant's position might be thought to deprive plaintiff of the substantial right it has to test in court an illegal administrative act, and suggests somewhat impracticable methods for plaintiff to preserve that right. We quote from the record on rehearing (R. 14, 15), defendant's counsel speaking:

It might be asked, "How otherwise would he claim that it was wrong for the President to do it?" He can do it in two ways, very simple. While the quota was still open he could have tendered an entry of five pounds of peanuts, and refused to pay the two cents a pound, and then he could have protested, and his protest would have been heard right in this Court, that the Collector had no right to refuse his entry, because the President had no right to put both a quota and a fee on the peanuts. He would then be in the position where he had not accepted the benefits of one part of the act and attack the other part as *unconstitutional*.

By the same token, he could have waited until after the quota was filled. Then he could have offered the Collector an entry of peanuts with the two cents a pound, and again, have protested the refusal of the Collector to accept that entry, on the ground that the President could not put a quota on and at the same time increase or put a fee on. He was perfectly willing to pay the fee, but the Collector would not accept it. So he would have been in the Court, and he would not have been in the position where he is now, that he has accepted all the benefits of the act, and he is asking you here, "We have done this, but we don't think that we should pay the two cents a pound." [Emphasis supplied.]

Here, again, defendant assumes that plaintiff's attack on the imposition of the fee rests on a complaint that, while the quota modification was constitutional, the fee imposition was unconstitutional. The plaintiff does not make this complaint. In any event, and on defendant's assertion of such claim, we hold there is no issue here as to constitutionality.

The methods defendant's counsel urges, quoted above, by which plaintiff might, in defendant's view, have safeguarded its right, under section 514, to test the legality of an administrative act, are not quite so completely protective as defendant appears to think.

Defendant has often moved in this court for dismissal of protests on the ground that the collector's assessment had not yet been paid. It is interesting to find defendant now arguing that importers may decline to pay an assessment and, nevertheless, proceed to judgment in this court on protest. Moreover, there could be no right to import 5 pounds of quota peanuts and challenge the legality of the fee on them, if there is no right to import 219,973 pounds of quota peanuts and challenge the fee on them. We know of no legal theory supporting such distinction.

The second suggestion advanced by defendant's counsel appears to imply that plaintiff would contend that the fee is lawfully imposed but that the quota modification is unlawful. If there is one thing quite clear, it is that plaintiff's contention is the exact reverse.

This should dispose of the argument, but it may be as well to point out, also, how unlikely it was that plaintiff could obtain final decision in a test case in time to import further quota peanuts within the crop year.

The peanut quota as modified by the proclamation of March 9, 1955, was for a crop year ending June 30, 1955. So eager was this plaintiff (and other importers, as well) to litigate promptly the issue now before us, that protest was filed at once after entry and without waiting for the collector to liquidate. This protest the defendant moved to dismiss, in open court, on the ground that it was filed before there was any decision of the collector that could be protested under section 514. We granted defendant's motion, and the early protest was dismissed. *Idem*, 37 Cust. Ct. 1, C.D. 1791.

This entry was not liquidated by the collector until July 8, 1955, after the expiration of the quota year. (The President, on May 16, 1955, extended the quota year 1 month, from June 30, 1955, to July 31, 1955, and terminated the quota. T.D. 53808.) The importer, having already filed the prompt protest to which defendant objected as premature, had a period of 60 days *after* the collector made his decision, on July 8, 1955, within which to avail itself of the statutory right of protest. Protest was filed July 25, 1955, only 17 days after liquidation.

By administrative act beyond control of this importer, liquidation was deferred until a date which helped to make it impossible for a test to be decided before the end of the quota year. It is now nearly 4 years after the collector's liquidation, and there is not yet a final decision of the issue.

There are several issues which we refrain from deciding, because the basis of our decision makes it unnecessary to do so. Two of these will be mentioned, without deciding them.

Defendant argues that it was the congressional intention to delegate to the President authority to impose with respect to importations of a basic commodity and for the same crop period, *both* a quota and a fee. Congress used the disjunctive "or," saying the President might impose a quota *or* a fee. There has been a long history of Executive action imposing either a quota or a fee, but not (except for the proclamation now before us) both a quota and a fee. It seems doubtful, to say the least, that Congress intended, as defendant urges, the conjunctive authority to impose *both* at one time as to the same commodity.

The use of the disjunctive by Congress in the statutory grant of authority, together with the circumstances of the action taken, tend to support the argument that the two provisions of the proclamation are indeed severable. This, in our opinion, it is not necessary to decide, for we hold that there is no issue as to constitutionality and that there is the right to judicial review as to whether the administrative act was or was not lawful.

The great respect rightly owed to the presidency and the deference due the President should not divert courts from their duty to protect litigants against the consequences of administrative acts, at any level, which are beyond the scope of authorization. Ours is a Government of laws and not of men, and courts have a major responsibility to keep it so.

Nothing on the rehearing has caused us to reverse our prior decision. Except as herein supplemented or modified, our prior opinion is affirmed. The same judgment previously entered for plaintiff will again be entered.

DISSENTING OPINION

RICHARDSON, Judge: On April 19, 1955, plaintiff imported into the United States 219,973 pounds of shelled peanuts. In addition to the regular duty of 7 cents per pound to which the imported peanuts were subject, by virtue of the provisions of 19 U.S.C., section 1001, paragraph 759 (par. 759 of the Tariff Act of 1930), the collector of customs assessed and collected a fee of 2 cents per pound. No question has been raised as to the regular duty, but plaintiff, by this protest, challenges the legality of the exaction of the additional fee of 2 cents, which was made under the authority of Presidential proclamation 3084 of March 9, 1955 (T.D. 53755) (69 Stat. ch. 22). This proclamation was issued under the authority of section 22 of the Agricultural Adjustment Act, as amended (7 U.S.C. § 624), which authorized the President of the United States to impose by proclamation "such fees . . . or such quantitative limitations" on the amount of peanuts that may be entered or withdrawn from warehouse, for consumption, if such limitations or fees are found to be necessary to prevent an influx of imported peanuts in quantities sufficient to render or tend to render ineffective, or materially interfere with the domestic crop limitation program of the Department of Agriculture. Authority to modify a proclamation or any provision thereof whenever the President finds or proclaims that changed circumstances require such modification in order to carry out the purposes of section 624 is also granted in subparagraph (d), which reads as follows:

(d) After investigation, report, finding, and declaration in the manner provided in the case of a proclamation issued pursuant to subsection (b) of this section, any proclamation or provision of such proclamation may be suspended or terminated by the President whenever he finds and proclaims that the circumstances requiring the proclamation or provision thereof no longer exist or may be modified by the President whenever he finds and proclaims that changed circumstances require such modification to carry out the purposes of this section.

Pursuant to the authority granted the President in 7 U.S.C., section 624(b), to "impose such fees not in excess of 50 per centum ad valorem or such quantitative limitations on any article or articles which may be entered, or withdrawn from warehouse, for consumption as he finds and declares" necessary to effectuate the purposes of the statute, Presidential proclamation 3019, establishing an annual peanut import quota of 1,709,000 pounds, was issue on June 8, 1953. It is admitted that the prescribed statutory procedures were strictly followed in connection therewith. Subsequent to the issuance of this proclamation, a severe drought in two of the major peanut-producing areas caused a great reduction in the production of domestic peanuts. The Tariff Commission, on its own motion, pursuant to a reservation contained in its report to the President in 1953, upon which he acted in issuing proclamation 3019, instituted an investigation into the peanut situation, supplemental to the investigation which it conducted in 1953, for the purpose of making recommendations to the President as to whether or not additional peanuts should be permitted to be imported. Public notice was given that ". . . The Commission has received information indicating that the entry of an additional quantity of peanuts during the current quota year may be necessary to meet essential requirements of domestic peanut users. The purpose of this supplemental investigation is to determine whether there is such need for an additional quantity of imported peanuts, and, if so, what additional quantity might be permitted to be entered during the current quota year without materially interfering with or rendering ineffective the peanut program of the Department of Agriculture." Hearings were held, in which plaintiff participated through its representative, A. S. Yohalem (exhibit 2B (vol. 2), p. 324), and, on the basis of the investigation and hearings, the Tariff Commission recommended to the President that, during the remainder of the 12-month period, beginning July 1, 1954,

imported peanuts should be *admitted subject to a fee of 2 cents per pound* but not more than 50 per centum ad valorem *on 48,000,000 pounds* and subject to a fee of 4 cents per pound after 48,000,000 pounds had been admitted.

Thereafter, on March 9, 1955, the President issued Presidential proclamation 3084, which purported to modify proclamation 3019, by permitting the entry of 51,000,000 pounds (aggregate quantity) of peanuts *"subject to a fee of 2 cents per pound* but not more than 50 per centum ad valorem." [Emphasis supplied.] As has been stated, plaintiff imported peanuts under this proclamation, but challenged the authority of the collector to exact the 2-cent fee.

In the case of *The Best Foods, Inc.* v. *United States*, 39 Cust. Ct. 305, C.D. 1945, in which the writer of this dissent did not participate, the court sustained the claim made in the protest that the fee of 2 cents per pound was invalid. An order was entered directing the collector to reliquidate the entry and make refund accordingly. In the course of its decision, the court considered the meaning of the word "modify" and concluded that it "connotes a limitation, not an extension, of that which is modified," and "not a major change, but an alteration only in the thing modified." Applying this concept of modification to the action of the President in proclaiming the quota and fee provisions of proclamation 3084, the court found that while the imposition of the quota constituted a modification, the fee provision imposed a new burden and could not be considered in any sense as modifying proclamation 3019. In this rehearing, defendant contends that the court was in error in applying to the term "modify" such a narrow and restrictive meaning.

In view of the various judicial definitions indicating the contrary, I do not feel that the word "modify" *necessarily* connotes a limitation, and not an extension of that which is modified. The term is said to have many meanings and is to be interpreted "in the light of the context in which it is used." 58 C.J.S. 840. It is true that the lexicographers, in some instances, define "modify" as meaning to reduce rather than to increase the thing modified, but the cases are numerous in which the courts, in interpreting the term, have not adhered to this restrictive meaning. A few citations will serve to illustrate the point.

In the case of *Jarman* v. *Collins-Hill Lumber & Coal Co.*, 286 N.W. 526, 226 Iowa 1247, the power given to a commissioner to modify a workmen's compensation award was said to be "the power to change, the power to *increase* as well as reduce, the arbitration award." [Emphasis supplied.] Statutory authority of a district court to modify tax assessments, on appeal, was held to authorize the court to *increase* as well as decrease the assessment, although statutory notice was not given in *McGoldrick Lumber Co.* v. *Benewah County et al.*, 35 P. (2d) 659. In *Evans* v. *Henson*, 37 S.E. (2d) 164, 73 Ga. App. 494, an addition of sweetened, condensed milk to other items which plaintiff was allowed to sell under provisions of a written contract to serve as salesman for defendant, for which plaintiff was to receive a commission of only 3 per centum, together with addition of other territory to that specified in a written contract in which plaintiff was allowed to sell goods and receive commissions on his sales therein, was held effective as a "modification" of the written contract. In Black's Law Dictionary, 4th edition, the word "modification" is defined as "a change; an alteration which introduces new elements into the details, or cancels some of them, but leaves the general purpose and effect of the subject-matter intact." And the meaning given the word "modify," in the same dictionary, is "to alter; to change in incidental or subordinate features; enlarge, extend; limit, reduce." Accord, *In Re Independent Consol. School Dist. No. 16*, 63 N.W. (2d) 543. The court, in *The Best Foods, Inc.*, case, *supra*, quoted from Webster's New International Dictionary, second edition, as follows:

**Modify** \* \* \* **2.** To reduce in extent or degree; *to moderate; qualify; lower; as*, to *modify* heat, pain, punishment. \* \* \* **4.** To change somewhat the form or qualities of; to alter somewhat; as, to *modify the terms of a contract*. \* \* \* [Emphasis supplied, except for word "modify."]

In the *Evans* v. *Henson* case, *supra*, a sales *contract* was modified by adding thereto *an entirely new product* and *additional territory*. Thus, it appears that even the lexicographic definition above quoted is broad enough to embrace the introduction of *new elements* into the thing being modified, since it uses the modification of a contract as an example to illustrate the definition given.

In the case of *State Airlines, Inc.* v. *Civil Aeronautics Board*, 174 F. (2d) 510 (reversed in *Civil Aeronautics Board* v. *State Airlines, Inc.*, 338 U.S. 572), cited in *The Best Foods, Inc.*, case, *supra*, the United States Court of Appeals for the District of Columbia, in a two-to-one decision, reversed an order of the Civil Aeronautics Board awarding to Piedmont Aviation, Inc., a certificate of convenience and necessity to engage in air transportation along routes which were said to have differed greatly from those sought by Piedmont. In applying for the routes, the applicant inserted in its application a so-called "catch-all clause" seeking the authority to transport along "the routes detailed herein, or such modification of such routes as the Board may find public convenience and necessity require." The Civil Aeronautics Act empowered the board to issue certificates "authorizing the whole or any part of the transportation covered by the application, if it finds that the applicant is fit, willing, and able to perform such transportation properly." The United States Supreme Court, in *Civil Aeronautics Board* v. *State Airlines, Inc.*, *supra*, said, "The Court of Appeals read this language as showing a congressional purpose to bar the Board from granting any certificates in which the routes awarded deviate more than slightly from the precise routes defined in the application." In the light of this interpretation of the statutory provision, the Court of Appeals viewed the application filed by Piedmont and the routes awarded to it by the board, and, since the latter deviated greatly from the routes specifically requested by the applicant, concluded that Piedmont had not applied for the routes awarded or, in other words, that Piedmont's application did not cover the routes awarded to it. It seems apparent that the meaning of slight alteration, toning down, and limiting, given to the term "modification" by the Court of Appeals, in applying the term to the action of the board, was *directly influenced by its interpretation of the language of the statute set out above*. The only authorities relied on by the Court of Appeals for the restrictive meaning attributed to the term was a definition from volume VI of the Oxford English Dictionary (1933 edition) and a judicial interpretation of the word "modify," as it was used in connection with certain divorce proceedings in the case of *Linn* v. *Linn*, 242 Ala. 688, 8 So. (2d) 187. In the *Linn* case, the Supreme Court of Alabama, acting under a statute authorizing an appeal from an order *modifying* a divorce decree, dismissed the appeal where the lower court had *set aside* the divorce decree. It must be assumed that the Court of Appeals was familiar with the various judicial constructions placed upon the terms "modify" and "modification" and that the definition adopted was selected because it accorded with the interpretation that the court felt the factual situation of the case required; a situation entirely different from that in the instant case. In fact, in the instant case, the modification of the quota phase of proclamation 3019 was an extension. The quota of 1,709,000 pounds was increased by an additional 51,000,000 pounds. The 1,709,000 pounds quota could not be "toned down," further restricted, or reduced by adding 51,000,-000 pounds to it. It appears that the interpretation of the word "modify" by the United States Court of Appeals for the District of Columbia, in the case of *State Airlines, Inc.* v. *Civil Aeronautics Board*, *supra*, cannot be considered as determinative of the interpretation that should be given the term "modify" in the present proceedings.

Although the Supreme Court, in reversing the Court of Appeals, did not discuss the meaning of the term "modification," it stated, in its opinion, at page 575, "We hold that Piedmont's applications were sufficient to permit certification of Piedmont for the routes awarded," and this statement, in our opinion, appears to negative, if indirectly, the finding of the Court of Appeals that the routes awarded Piedmont could not be considered a modification of the routes sought.

In the light of the foregoing cases and the many other cases defining "modify" and "modification," the interpretation given the term "modify" in *The Best Foods, Inc.* v. *United States, supra*, is not required. The President could modify his proclamation within the four corners of section 22(d) and the part of section 22(b) which it incorporates by reference (7 U.S.C. § 624(d)), and this included the imposition of a fee provided for in the section, even though the imposition of the fee was the addition of *a new element*. The imposition of a fee changed the mode in which the subject of proclamation 3019 (importation of peanuts) was dealt with, but did not change the subject itself, and this, too, has been said to constitute a modification. 58 C.J.S. 840. Therefore, we are of the opinion that the term "modify" is broad enough to embrace the imposition of a fee in the modifying proclamation, where only a quota had been proclaimed in the original proclamation. In modifying his original proclamation, the President could impose any condition which was open to him when he issued the original proclamation.

It is true that the notice of the Tariff Commission announcing the hearing to consider permitting the importation of an additional quantity of peanuts did not mention the imposition of fees. This subject developed at the hearings and was deemed necessary by the Tariff Commission to effectuate the purposes of section 22, one of which was to avoid interference with the peanut program of the Department of Agriculture. To say that since the public notice did not state that fees were to be considered as a condition to be imposed upon entering or withdrawing peanuts from a warehouse for consumption, the Tariff Commission could not consider fees, is to say that the Tariff Commissioners must first determine whether a quota or fee is feasible before they conduct their investigation, which ostensibly is to aid them in determining this matter. Also, the plaintiff was present and participated in the hearings before the Tariff Commission, through its representative, and the record does not indicate any objection on the part of its representative to the imposition of fees after the Commission ruled that the subject was properly before it. This case is distinguishable from *Carl Zeiss, Inc.* v. *United States*, 23 C.C.P.A. (Customs) 7, T.D. 47654; 76 F. (2d) 412. In the *Zeiss* case, the Tariff Commission was limited to the consideration of particular merchandise by a specific directive to the Commission contained in Senate Resolution 227, see Congressional Record, volume 75, part II, page 12550, to investigate "the differences in the cost of production between the domestic articles and the foreign articles, and to report, at the earliest practicable date, upon the following articles:

2. Optical instruments of a class or type *used by* the Army, Navy, or Air Force for fire control and parts thereof. [Emphasis added.]";

the complainant received the notice of the Tariff Commission and did not attend the hearing, because it was not interested in the merchandise schedule for consideration according to the notice, and the Commission considered merchandise different from that in its notice and merchandise that complainant was interested in. In this case, the merchandise considered at the hearing by the Tariff Commission was the merchandise described in the Commission's notice, and the complainant was present and participated in the hearing through its representative. (Exhibit 2B (vol. 2), p. 324.)

The preliminary steps to issuance of the proclamation had been completed before the President made his findings of fact as to changed circumstances. The Tariff Commission had held its investigation pursuant to its public notice. The Commission, after considering everything that was said at the hearings and the purpose of the statute, concluded that a limited quantity (48,000,000 pounds) of peanuts should be permitted to be entered, or withdrawn from warehouse for consumption, subject to a fee of 2 cents per pound and that an unlimited quantity above 48,000,000 pounds should be permitted to be entered, or withdrawn from warehouse for consumption, subject to a fee of 4 cents per pound, during the remainder of the 12-month period beginning July 1, 1954. (Exhibit 2G, pp. 3–4).

The President took the first part of the recommendation of the Tariff Commission providing for a quota of 48,000,000 pounds of peanuts subject to a fee of 2 cents per pound and raised the quota to 51,000,000 pounds of peanuts subject to a fee of 2 cents per pound. He rejected the balance of the recommendation providing for an unlimited quantity above the quota of 48,000,000 pounds. The President was not bound by the Commission's findings, but was even free to arrive at his conclusions from information derived from other sources. *Foster* v. *United States,* 20 C.C.P.A. (Customs) 15, T.D. 45673.

The intention of the President that the additional peanuts were not to be imported, except upon the payment of a fee of 2 cents per pound, was clearly indicated in the following portion of proclamation 3084:

WHEREAS, on the basis of the said supplemental investigation and report of the Tariff Commission, I find that changed circumstances require the modification of the existing quota restrictions on peanuts * * * so as to permit the additional quantity of peanuts hereinafter described to be entered, or withdrawn from warehouse, for consumption during the remainder of the quota period ending June 30, 1955, *subject to the fee hereinafter proclaimed*; and

WHEREAS, I find and declare that the entry, or withdrawal from warehouse, for consumption *of such additional quantity of such peanuts subject to such fee* will not render or tend to render ineffective, or materially interfere with, the said program of the Department of Agriculture with respect to peanuts, nor reduce substantially the amount of products processed in the United States from peanuts with respect to which such program is being undertaken:

Now, THEREFORE, I, DWIGHT D. EISENHOWER, President of the United States of America, acting under and by virtue of the authority vested in me by the said section 22 of the Agricultural Adjustment Act, as amended, do hereby proclaim that the said proclamation of June 8, 1953, as amended by the said proclamation of June 30, 1953, is hereby *modified* so as to permit the entry, or withdrawal from warehouse, for consumption during the remainder of the 12-month period beginning July 1, 1954, of not more than 51,000,000 pounds (aggregate quantity) of peanuts, shelled, blanched, salted, prepared, or preserved (including roasted peanuts, but not including peanuts not shelled or peanut butter), of sizes averaging in representative samples more than 40 kernels per ounce, *subject to a fee of 2 cents per pound* but not more than 50 per centum ad valorem: *Provided,* That the said fee shall be in addition to any other duties imposed on the importation of such peanuts. [Emphasis supplied.]

It is evident, therefore, that the fee provision is an integral part of the scheme permitting entry of additional peanuts. The President found that the entry of additional peanuts subject to such fee would not render ineffective or interfere with the peanut program of the Department of Agriculture. The President's judgment in this regard may not be judicially reviewed. *United States* v. *George S. Bush & Co., Inc.,* 310 U.S. 371. The court cannot assume that the President would have found that entry of additional peanuts, without payment of a fee, would have had no injurious effect on the peanut program. It follows that if the fee provision is stricken from the proclamation, the intent of the President to permit the entry of the additional quantity of peanuts only subject to a fee, is rendered ineffective.

Plaintiff contends that the word "or" in the phrase "such fees . . . or such quantitative limitations . . ." in subparagraph (b) of section 624 is a disjunctive marking an alternative, and, therefore, the President did not have the authority to impose simultaneously a quota restriction and a fee. Defendant contends that section 22 is a remedial statute in which "or" should be interpreted broadly to mean "either or both," so as to achieve flexibility in application of the remedies to the problem. It is noted that the Report of the House Committee on Agriculture states ". . . the bill amends section 22 so as to permit the President, upon the recommendation of the United States Tariff Commission, to impose either an importation fee or an importation quota, whichever under the circumstances is determined to be better adapted for the protection of any particular farm program"; and that a participant in the hearings, Stephen Pace of Americus, Ga., who appeared on behalf of all of the organizations of peanut growers in the United States and all of the peanut shellers in the United States (and who was a Congressman from the Third Congressional District of Georgia and a member of the House Committee on Agriculture at the time the Committee report was submitted on the bill to amend section 22 permitting the imposition of a fee), wanted the imposition of a quota and a fee, and the Department of Agriculture insisted that it be recorded as being of the opinion that a quota and a fee were possible. (Exhibit 2B, vol. 3, p. 541.) There is no discussion by either party of the reference to "fees *and* limitations imposed by the President by proclamation under this section [22]" [emphasis added] in subparagraph (c). Without deciding whether the President could or could not impose a fee in addition to fixing a quota, it is freely conceded by the majority of the Tariff Commission and by the Department of Agriculture that he could do either. The fee provision may not be deleted from the proclamation as a severable part thereof, and if, as plaintiff contends, the fee provision is invalid, the quantitative provision must fall with it, and plaintiff's case would be destroyed.

Regardless of the argument advanced that the plaintiff's right to import peanuts stems from its status as a citizen, the right to import the particular peanuts involved in this action was derived solely from proclamation 3084. Proclamation 3084 was issued pursuant to a proper delegation of legislative power to the President by the Congress of the United States and has the same status as a statute or law passed by that body and is subject to the same rules of construction. When part of a proclamation is determined to be illegal, *ultra vires*, and, hence, void, "the test of validity of the remainder to be applied in such a case would appear to be the same as that applied in cases of partial invalidity of statutes due to unconstitutionality. . . ." *United States* v. *Bitumuls & Asphalt Co. et al*, 44 C.C.P.A. (Customs) 199, 206–207, C.A.D. 661. The situation before the court in this case is similar to that involved in *George G. Wislar* v. *United States*, 26 C.C.P.A. (Customs) 138, C.A.D. 7, cert. den., 305 U.S. 629, where the constitutionality of a proviso in the Reciprocal Trade Agreements Act of 1934 was under attack. The act gave authority to the President to enter into foreign trade agreements and to proclaim the modification of existing duties required to carry out such agreements, said proclaimed duties to apply to imports from all foreign countries, provided, however, that the President might suspend the application to the imports from any country because of its discriminatory treatment of American commerce. Pursuant to this act, a reciprocal trade agreement was entered into with Sweden, according to which, among other things, the duty on files was reduced from 77½ cents to 45 cents per dozen. Thereafter, the reduced rates were suspended as to Germany, because of discriminatory practices, and the collector assessed duty on files imported from that country at the higher rate provided in the tariff act. Plaintiff protested, claiming that that portion of the

Reciprocal Trade Agreements Act which attempted to empower the President to suspend the generalization clause making trade agreement rates applicable to all countries was unconstitutional. The court noted, in its opinion (p. 141):

It is thus to be seen that appellant does not attack the constitutionality of the Reciprocal Trade Agreements Act as a whole. Upon the contrary, his entire case rests upon the validity of the authority conferred upon the President to negotiate trade agreements plus the validity of the generalization clause, except the proviso thereto, which proviso clearly is an integral part of that clause separated from it only by the usual punctuation mark—a colon. Of necessity, appellant must uphold the validity of the authority granted and the validity of the affirmative portion of the generalization clause or his case falls.

 . . . . . . .

In the final analysis, as we view the controversy, the question which first must be determined is whether the provision of the act which appellant invokes to support his claim and the provision thereof which he attacks are separable, so that appellant may invoke the one and, at the same time, attack the other. If not separable, there is an end to the controversy; if separable, then other issues must be considered.

The court found that the proviso was not separable, on the ground that it was not the intent of Congress that it be divisible from the generalization clause; that the entire purpose and spirit of the Reciprocal Trade Agreements Act negatived such an intent; and that the proviso, if dissevered from the rest of the act, would be practically meaningless. The court stated, further, that appellant's contention that the generalization clause operated, by reason of the agreement with Sweden, to repeal the Tariff Act rate of duty, could be sustained only by holding the proviso separable and unconstitutional, while, at the same time, declaring the validity of the other portion of the clause. The court held that this might not be done, and that, since a holding that the entire clause, or the entire act, was unconstitutional would utterly destroy appellant's case, it was not called upon to consider that question.

In *Ernest E. Marks Co., a Corporation* v. *United States*, 28 C.C.P.A. (Customs) 286, C.A.D. 156, cert. den., 313 U.S. 584, appellant contended that subsection (a) of the Reciprocal Trade Agreements Act was constitutional, but that subsection (b) was not. The court said (p. 293):

. . . If the act as a whole unlawfully delegates to the President legislative authority, it logically follows the the entire act must fall as being unconstitutional. This would include the generalization clause upon which appellant relies as the basis for its recovery in this litigation. Since the appellant depends upon a portion of the act for its relief and since the act is either constitutional or unconstitutional as a whole, appellant cannot successfully argue that the act is constitutional for one purpose and unconstitutional for another. Therefore, it seems to us that as far as granting relief to appellant is concerned, it must necessarily follow that if the act is constitutional, appellant is not entitled to any relief, under our interpretation of the same, and if it is unconstitutional, the generalization clause falls and appellant has no basis for the assertion of the right claimed under the Trade Agreements Act.

In the instant case, plaintiff's contention may be sustained only by holding the fee provision separable and invalid while at the same time declaring that the balance of the Presidential proclamation is valid. For the reasons stated, this may not be done.

Even if it be assumed that the provisions of Proclamation 3084 are divisible, it is not possible to determine whether the President would choose the quota or the fee to be operative, and this court certainly cannot make the determination for him. To do so, would be to usurp the function of the President and to substitute our judgment for his. This we cannot do. The choice would be for the President alone to make.

I do not share the view that plaintiff was without a remedy, except the one pursued. In the writer's opinion, the declaratory judgment statute was designed to provide relief in just such a case as this one. 28 U.S.C., section 2201, provides as follows:

In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

This statute permits the pacifying ministration of an adjudication where a complainant's "legal interest," as here, is rendered uncertain or insecure by proposed acts of the Government. The cases cited by the plaintiff, in its brief in support of its contention that a suit for a declaratory judgment was not available to it, have reference to controversies expressly excepted from the declaratory judgment statute or to instances in which an alleged "wrong" has been committed, damages have been incurred, and the Government has not given its consent to be sued. I concur with the majority of the court that, in the involved matter, the Government has consented to be sued under section 514 of the Tariff Act of 1930. The declaratory judgment act does not enlarge this jurisdiction of the court, but merely provides an additional remedy in order to remove an uncertainty and afford speedy relief. *Raydist Navigation Corporation, Plaintiff* v. *United States of America, Defendant*, 144 F. Supp. 503; Borchard's Declaratory Judgments (2d ed., 1941) page 927, *et seq.* It is an action in which the court may order a speedy hearing and advance it on the calendar where circumstances warrant. Plaintiff could have filed its suit for a declaratory judgment immediately upon contracting for the peanuts, without waiting for their arrival and the payment of the fee.

It is not deemed necessary to discuss the contention in plaintiff's protest that ". . . the establishment and assessment of the fee in these cases, and the provisions of the Act if construed to authorize the fee are a violation of the Constitution of the United States and a deprivation of property without due process of law."

For the reasons stated, I would overrule the protest.