The BEST FOODS, INC.

v.

UNITED STATES.

C.D. 2396; Protest 305961–K.

United States Customs Court,
Third Division.

May 6, 1963.

Richardson, J., dissented.

Sullivan & Cromwell, New York City (William Piel, Jr., New York City, of counsel), Barnes, Richardson & Colburn, New York City, Associate Counsel (Joseph Schwartz, New York City, of counsel), for plaintiff.

John W. Douglas, Asst. Atty. Gen. (Richard E. FitzGibbon and Sheila N. Ziff, New York City, trial attorneys), for defendant.

Before JOHNSON, DONLON, and RICHARDSON, JJ.

DONLON, Judge.

This litigation challenges the legality of a fee, at the rate of 2 cents per pound, exacted on imported peanuts pursuant to a Presidential proclamation, issued under the Agricultural Adjustment Act, namely, proclamation 3095, of May 16, 1955 (T.D. 53808). This proclamation purports to modify earlier Presidential proclamations 3019 and 3084.

The peanuts of this suit were imported on May 25, 1955, and May 26, 1955, after the effective date of proclamation 3095.

In an earlier litigation, this plaintiff challenged the legality of a fee, likewise at the rate of 2 cents per pound, which had been exacted on imported peanuts pursuant to Presidential proclamation 3084 of March 9, 1955 (T.D. 53755). Plaintiff's claim in that litigation was sustained. The Best Foods, Inc. v. United States, 39 Cust.Ct. 305, C.D.1945; affirmed on rehearing, 42 Cust.Ct. 310, Abstract 62865; affirmed on appeal, United States v. Best Foods, Inc., 47 CCPA 163, C.A.D. 751. Neither here, nor in the earlier case, was there any question as to the regular duty on imported peanuts, at the rate of 7 cents per pound, imposed under paragraph 759 of the Tariff Act of 1930. Controversy, there and here, solely relates to what is called a "fee" at the rate of 2 cents per pound, imposed by Presidential proclamation under the Agricultural Adjustment Act, in addition to the regular duty.

Section 22 of the Agricultural Adjustment Act, as amended (7 U.S.C., section 624), authorizes the President to impose either fees or quantitative restrictions (quotas) on the importation of foreign articles when he finds that such articles are or are likely to be imported *under such conditions and in such quantities* as to render, or tend to render, ineffective the Government price support program for so-called basic agricultural commodities, or reduce substantially the amount of any product processed in the United States from such an agricultural commodity. One such commodity is peanuts.

Peanuts had been for some time prior to proclamation 3095 subject to quantitative restrictions under section 22. As recited in our opinion in Best Foods, Inc., supra, the President, in peanut proclamation 3019, of June 8, 1953, restricted importation of peanuts to a quantity not in excess of 1,709,000 pounds in a crop year. This quota was prescribed for peanuts in all forms, save only peanut butter. First made effective for the year beginning July 1, 1953 (T.D. 53289), that quota was continued without change until the 1955 crop year.

In early 1955, it became known in Washington that frost had seriously damaged the domestic peanut crop. Presumably, peanut imports in excess of the quota of 1,709,000 pounds per year were thought of as not threatening the price support program. Moreover, in view of the frost-induced domestic crop curtailment, peanuts for processing were in short supply. On March 9, 1955, following a Tariff Commission investigation and report, the President issued proclamation 3084 (T.D. 53755). In proclamation 3084, which became effective March 9, 1955, the President modified his earlier proclamation 3019 (as previously amended by proclamation 3025, T.D. 53289, in respects that are not material to this litigation) so as to increase the quota of certain sizes of shelled peanuts that might be imported during the remainder of the year ending June 30, 1955. The proclamation made peanuts of the quota increase subject to a fee of 2 cents per pound, in addition to the regular tariff of 7 cents per pound.

Plaintiff, in Best Foods, Inc., supra, contended that proclamation 3084 was invalid on the ground, inter alia, that the President had failed to follow the procedure prescribed by Congress in section 22. Such statutory procedure, so plaintiff argued, is a basic condition to which the executive is subject in exercising the congressional grant of authority. Plaintiff also contended that Congress had not granted authority to the President to impose both a fee and a quota on peanuts. A majority of this division held that the

fee, newly proclaimed in proclamation 3084, did not constitute mere modification of the prior proclamation 3019, which had established only a quota restriction, but imposed a new and different burden. We, therefore, held proclamation 3084 invalid, because the procedures prescribed by Congress in section 22(a), as requisite to the imposition of a fee under section 22(b), had not been followed. We also held proclamation 3084 invalid, as to the fee, because of an infirmity in the Tariff Commission notice of supplemental investigation, which failed to specify or otherwise give notice that the inquiry would inquire into the need for a fee.

Defendant appealed from our decision. The court of appeals affirmed our judgment, but not on the grounds of our decision. We had deemed it unnecessary, because of our decision as to procedural noncompliance, to decide the substantive issue, namely, whether the President had power to impose both a fee and a quota. The majority of this division indicated as their view that such authority had not been conferred. That was the decision of the court of appeals. The appeals court refrained from expressing an opinion on the procedural issue. It, therefore, arises again in this litigation.

There is no dispute as to what proclamation 3095 was, or as to the proceedings which triggered the proclamation. The official papers are in evidence. Counsel have signed a stipulation of facts, with documentary exhibits annexed, which plaintiff has offered in evidence. Defendant reserved the right to object to the offer, but conceded truth and authentication. Defendant has offered no objection of record and, in its brief, tacitly accepts the stipulation of facts and appended exhibits as part of the record in this proceeding. We deem that defendant has abandoned the reserved right to object. The stipulation of facts and appended exhibits are received in evidence as plaintiff's exhibit 1, with appended documents designated, for reference, by lettered subheadings 1–A, 1–B, and 1–C.

As earlier observed, in proclamation 3019, the President fixed an annual quota

on importation of peanuts in every form, except only as peanut butter. There was no fee imposed. In proclamation 3084, the President modified the quota of proclamation 3019, increasing the quantity of stated sizes of shelled peanuts that could be imported, but not the quantity of inshell peanuts or of other sizes of shelled peanuts. Peanuts of the new quota were made subject to a fee of 2 cents per pound. There was no fee as to other quota peanuts. Our appeals court held that proclamation 3084 was "invalid, insofar as it imposes a fee * * *." (United States v. Best Foods, Inc., 47 CCPA 163, at page 172.)

The United States Tariff Commission gave public notice on April 1, 1955, that a new supplemental investigation had been instituted, under the provisions of section 22(d) of the Agricultural Adjustment Act, to determine—

"* * * whether the deficit in the domestic supply of peanuts is such as to require an increase in the quantity of peanuts, shelled, unshelled, blanched, salted, prepared, or preserved which may be permitted to be entered, or withdrawn from warehouse, for consumption during the quota year ending June 30, 1955, and during the quota year beginning July 1, 1955, to meet essential requirements of domestic peanut users, and, if so, what additional quantity or quantities of peanuts may be permitted to be so entered or withdrawn without materially interfering with or rendering ineffective the peanut program of the Department of Agriculture."

The notice further recited the substance of proclamations 3019 and 3084 (the latter having since been found invalid as to imposition of a fee) and noted that the new investigation was prompted by a letter from the Secretary of Agriculture to the Chairman of the Tariff Commission, dated March 31, 1955, indicating that the quantity of peanuts on hand was less than the quantity needed to meet domestic requirements. This notice was published, and a public hearing was held on April 19, 1955. (Exhibit 1–A.) Transcript of the hearing record shows that Mr. A. S. Yohalem, vice president of The Best Foods, Inc., plaintiff here, was one of several industry representatives who appeared at the hearing and testified. (Exhibit 1–B.) On May 5, 1955, the Tariff Commission transmitted its report to the President. (Exhibit 1–C.)

The President issued proclamation 3095 under date of May 16, 1955. After reciting the substance of prior proclamations 3019 and 3084, including the invalid fee, the new proclamation 3095 recites that the United States Tariff Commission has made a second supplemental investigation pursuant to section 22(d) of the Agricultural Adjustment Act, as amended—

"* * * to determine whether the deficit in the domestic supply of peanuts is such as to require an increase in the quantity of peanuts, whether shelled, not shelled, blanched, salted, prepared, or preserved, which may be permitted to be entered, or withdrawn from warehouse, for consumption during the quota year ending June 30, 1955, and during the quota year beginning July 1, 1955, to meet essential requirements of domestic peanut users, and, if so, what additional quantity or quantities of such peanuts may be permitted to be so entered or withdrawn without materially interfering with or rendering ineffective the peanut program of the Department of Agriculture;"

and has submitted to the President a report of its findings and recommendations. On the basis of this report, the President found that—

"* * * the deficit in the domestic supply of peanuts is such as to require the admission of an additional quantity of peanuts, as hereinafter proclaimed, to meet the essential requirements of domestic peanut users

until supplies become available from the 1955 domestic crop;"

and that—

"* * * the admission of such additional quantity of peanuts under the conditions and subject to the fee hereinafter proclaimed is necessary in order that the entry of such peanuts will not render or tend to render ineffective, or materially interfere with, the said program of the Department of Agriculture with respect to peanuts, or reduce substantially the amount of any product processed in the United States from peanuts with respect to which such program is being undertaken."

Upon these recitals, the President, acting under and by virtue of the authority of section 22 of the Agricultural Adjustment Act, as amended, proclaimed that proclamation 3019, as theretofore amended and modified, was further amended and modified, as follows:

"(1) to extend the current quota year for peanuts through July 31, 1955;

"(2) to permit an unlimited additional quantity of peanuts, shelled, blanched, salted, prepared, or preserved (including roasted peanuts, but not including peanuts not shelled or peanut butter), to be entered, or withdrawn from warehouse, for consumption on or before July 31, 1955, subject to a fee of 2 cents per pound, but not more than 50 per centum *ad valorem: Provided,* that the said fee shall be in addition to any other duties imposed on the importation of such peanuts; and

"(3) to establish hereafter as the quota year for peanuts the 12-month period beginning August 1 in any year.

"The said Proclamation No. 3084 of March 9, 1955, is hereby terminated." [Italics quoted.]

There is no issue as to extension of the quota year. There is no issue as to retention of the quota on in-shell peanuts, nor as to elimination of all quota restrictions on "peanuts, shelled, blanched, salted, prepared, or preserved." There is controversy only as to the "fee of 2 cents per pound, but not more than 50 per centum *ad valorem*" to which the described shelled peanuts "entered, or withdrawn from warehouse, for consumption on or before July 31, 1955 * * *" were made subject by proclamation 3095. It is the legality of the fee which plaintiff's protest challenges.

It does not appear why Congress, in the legislation conferring on the President authority to impose this financial burden by proclamation, designated it as a "fee" rather than as a tax. Clearly, Congress does not have unlimited power to impose financial burdens, or to authorize the executive to do so. The power of Congress to tax includes both the general powers enumerated in the Constitution, article I, section 8, paragraph 1, and the income tax power added by the 16th amendment. This "fee" is not an income tax and, hence, we need not consider the authority conferred by the 16th amendment.

If this "fee" is a burden which Congress could "lay and collect," it must be a tax, duty, impost, or excise. We are not required to hold that the imposition is beyond the power of Congress merely because, for some obscure reason, Congress chose to denominate it a "fee." We look to the legislation as a whole, in order to arrive at the congressional intention. In that view, it is clear that what is called a "fee" is, in truth, a duty laid on imported merchandise. Faber, Coe & Gregg, Inc. v. United States, 19 Ct.Cust. App. 8; United States v. Shallus & Co., 9 Ct.Cust.App. 168.

The "fee," by specific statutory provision, is to be deemed a duty for purposes of administration. Only in its effects on preferential tariff obligations, did Congress say that the "fee" is not to be deemed a duty. (62 Stat. 1249; 7 U.S.C. § 624(c).)

We hold that this "fee" was intended by Congress to be a duty, except that certain treaty effects were not to flow

from it. Congress has authority to "lay and collect" a duty.

Whether and how Congress may delegate to the executive branch of Government authority to make effective the duties that Congress has legislated, and to determine the rate of duty, is a decision reached somewhat less easily.

The power to legislate taxes may not be delegated to the executive. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570; Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446; Hampton, Jr., & Co. v. United States, 14 Ct.Cust.App. 350, affirmed, Hampton & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624.

Congress may authorize the executive to determine when the conditions, which were prescribed by Congress, have come into existence, so as to make effective the taxes Congress has imposed. Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294.

Congress likewise may authorize the executive to determine when conditions, prescribed by Congress, have come into existence, so as to require the increase or decrease of duties, within limits set by Congress, and to fix the rate of such increased or decreased duties. This is the so-called flexible tariff authority. Hampton & Co. v. United States, supra.

Congress may authorize the executive to determine when conditions, prescribed by Congress, have come into existence so as to require imposition of countervailing duties, as prescribed by Congress. Nicholas & Co. v. United States, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461.

Varied as these situations seem, and indeed they are, there is a common legal philosophy underlying the precedents. Under our form of Government, with powers divided between the legislative, executive, and judicial branches, one branch of Government may not usurp the constitutional powers of another branch. Nor may the Congress delegate to the executive a power which the Constitution has given to Congress. Such a power, given solely to Congress, is the power to tax. However, when Congress itself lays the tax, it may lawfully entrust to the executive branch of Government the limited authority to determine when the conditions, as prescribed by Congress, in fact exist, and, upon the happening of such event, the executive may be authorized to proclaim the effectiveness of the tax.

Congress, in furtherance of the agricultural price parity program, has provided, in section 22 of the Agricultural Adjustment Act, as amended, that if the President shall find, after investigation and report and recommendations of the Tariff Commission, that an "article or articles are being or are practically certain to be imported into the United States under such conditions and in such quantities as to render or tend to render ineffective, or materially interfere with, any program or operation" with respect to an agricultural commodity, "or to reduce substantially the amount of any product processed in the United States from any agricultural commodity or product thereof with respect to which any such program or operation is being undertaken," he (the President) "shall by proclamation impose such fees not in excess of 50 percentum ad valorem or such quantitative limitations on any article or articles which may be entered, or withdrawn from warehouse, for consumption as he finds and declares shown by such investigation to be necessary in order that the entry of such article or articles will not render or tend to render ineffective, or materially interfere with, any program or operation referred to in subsection (a) of this section [price support program for so-called basic commodities], or reduce substantially the amount of any product processed in the United States from any such agricultural commodity or product thereof with respect to which any such program or operation is being undertaken * * *." (64 Stat. 261; 7 U.S.C. § 624(b).)

Under this authority, Presidential proclamation 3019 was issued, imposing a quantitative limitation, but no fee, on

described articles of peanuts. Pursuant to such authority, and using the procedure for modification prescribed by Congress in section 22(d), the quantitative limitation of proclamation 3019 was modified by proclamation 3084 as to the importation of certain articles. The attempt, in proclamation 3084, also to impose a fee on imported peanuts was held invalid. Hence, in legal effect, proclamation 3084 merely relaxed somewhat **a** prior quantitative limitation, or quota.

What proclamation 3095, now before us for consideration, sought to do was (1) terminate certain (but not all) of the quantitative limitations of proclamation 3019 and all of the quantitative limitations of proclamation 3084, and (2) impose a fee on importation of the articles as to which the quantitative limitation was terminated. Proclamation 3095 also extended the crop year, but that is not an issue here and, therefore, we need not consider that feature of the proclamation.

It seems clear that termination of the quota as to certain articles is properly such a modification of the prior proclamations as Congress contemplated in the authority conferred on the executive by section 22(d). Indeed, termination is, by express language, a section 22(d) procedure.

Having in mind that no valid tax, or fee, then subsisted, have the congressional standards been met for executive action bringing into effect the tax, or fee, that proclamation 3095 purports to impose? What are those standards? Are they sufficiently precise to avoid the taint of an unconstitutional delegation?

Either the tax, or a quota, is to be imposed by Presidential proclamation when, and only when, there is a finding that articles are being imported, or are practically certain to be imported, into the United States, *under conditions and in quantities* which (1) render or tend to render ineffective, or *materially interfere with*, a Government price support program, or (2) reduce substantially the amount of domestic processing of the price supported agricultural commodity.

As our appeals court pointed out in Best Foods, Inc., supra, it seemed to Congress that a tax could be useful in certain situations where a quota might not be feasible. But if the basic conditions, as prescribed by Congress, do not subsist so as to require a quantitative limitation on imports, then those same basic conditions do not subsist so as to warrant imposition of a tax. The statutory conditions prescribed by Congress are identical for invoking protection to the agricultural commodity program against the threat of imports, either by a fee or by a quota. Only the choice of remedy, a tax or a quota, is the alternative permitted to the executive.

Having found that the conditions and quantities of actual or probable importation are such as to render or tend to render ineffective a price support program, or to reduce substantially the amount of any product processed in the United States from a price supported agricultural product, Congress provided that the amount of the tax or of the quantitative limitation to be proclaimed is to be such as is necessary so that the price support program shall not become ineffective.

The authority Congress conferred on the executive has, therefore, two bases, both of which are conditions laid on administration action: First, the fact, or probability, that importations of the articles are, or are likely to be, under such conditions and in such quantities *as to threaten the price support program*, directly or through reducing substantially the amount of the price supported product used in domestic processing, and this is a finding antecedent to the imposition either of a tax or a quota; and, second, when the finding has been made that is basic to imposition either of a fee or a quota, then the amount of the tax or the size of the quota imposed, as the case may be, shall be such (and only such) as is *necessary* so that the price support program shall not become ineffective, with a top limit of 50 per centum ad valorem.

These are the findings Congress has required. They are sufficient to guide the executive in carrying out the intention of

Congress. They are sufficiently precise to avoid the taint of an unconstitutional delegation.

Plaintiff argues, somewhat briefly to be sure, that these standards have not been met in the imposition of this fee on peanuts. We take it that plaintiff's view, somewhat inadequately stated, is that there was no finding that imports of peanut articles, actual or potential, were such as to threaten the price support program for peanuts during the period from May 16, 1955, to July 31, 1955, or that such imports were such as to threaten to limit domestic processing from price supported peanuts.

We are in agreement with this view. It appears from proclamation 3095 that motivation was not that the quantities of shelled peanuts imported, or likely to be imported, in the balance of the 1955 crop year threatened the price support program in any way, directly or indirectly. Rather, the purpose of proclamation 3095 was relief of domestic peanut processors from the consequences of short supply. There is in proclamation 3095 no finding that shelled peanuts then were, or were likely to be, imported under such conditions and in such quantities, during the 2½ months remaining in the extended 1955 crop year, as to threaten either the price support program or domestic processing from the price supported commodity. Yet, this is precisely the finding Congress requires, antecedent to limitation of imports by imposition either of a tax or a quota. The finding actually made has, in that respect, no relation to protection of the price support program, either directly or indirectly.

The finding that the amount of the tax, 2 cents per pound but not more than 50 per centum ad valorem, is such an amount as will not render ineffective the price support program, goes to the second of the two standards prescribed by Congress. Having found, as proclamation 3095 did not find, that importations actual or probable, during the brief period remaining in the extended crop year, threatened the price support program in one of the ways specified in the statute, a finding could have followed as to the *amount of tax* deemed by the President to be *necessary* so that the price support program should not become ineffective. The latter finding, relative to the *necessary* amount of a quota or a tax, is not alone enough.

We do not challenge the Presidential discretion in making his determination. We hold that, here, the President made no finding, as he was required by Congress to find, that, at the date of proclamation 3095, importations of shelled peanuts were such as to threaten, or as likely to threaten, the price support program of the Agricultural Adjustment Act, directly or by limiting domestic processing of the price supported commodity. It seems self-evident that, on the record before us, no such finding could have been made. Indeed, it is recited in the proclamation that the deficit in the domestic supply is such as to require admission of additional peanuts. This deficit seems not to be the condition of oversupply as a threat to the price support program, which Congress had in mind in delegating authority to impose a limitation on imports, either by way of a quota or a fee.

There have been numerous decisions, in this and other courts, construing the principles which delimit executive authority with respect to imposing taxes. Recently, these principles were reviewed by this division in Pan American Standard Brands, Inc., et al. v. United States, 43 Cust.Ct. 122, C.D. 2115. Tested by the rule there applied, we find that the present statute is not so uncertain as to render it invalid.

The difficulty here is not congressional uncertainty as to terms of delegation, but rather the failure of the executive to make a finding which Congress required as a condition precedent to exercise of the delegated authority.

In Wichita R. R. & Light Co. v. Public Utilities Commission, 260 U.S. 48, 43 S.Ct. 51, 67 L.Ed. 124, the statute required that a public utility commission should find that existing rates were unreasonable before it could reduce the rates. There was no specific requirement

that the order of the commission should itself contain such a finding. The United States Supreme Court held, nevertheless, that a commission order which reduced rates, entered after hearing, was void for lack of an expressly stated finding *in the order*, to the effect that existing rates had been found to be unreasonable. The conclusion which the Court reached took into account not only the language of the legislation which conferred the authority, but also the general principles of constitutional Government germane to legislative delegation of power to the executive. The Court stated the principles, as follows:

" * * * In creating such an administrative agency the legislature, to prevent its being a pure delegation of legislative power, must enjoin upon it a certain course of procedure and certain rules of decision in the performance of its function. It is a wholesome and necessary principle that such an agency must pursue the procedure and rules enjoined and show a substantial compliance therewith to give validity to its action. When, therefore, such an administrative agency is required as a condition precedent to an order, to make a finding of facts, the validity of the order must rest upon the needed finding. If it is lacking, the order is ineffective.

"It is pressed on us that the lack of an express finding may be supplied by implication and by reference to the averments of the petition invoking the action of the Commission. We can not agree to this." [260 U.S. p. 59, 43 S.Ct. p. 55.]

In Mahler v. Eby, 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549, the United States Supreme Court reviewed the validity of a warrant which had been issued by the Secretary of Labor for deportation of certain aliens. The warrant was issued under authority delegated to the Secretary of Labor by Congress, which provided that aliens of certain classes described in the act, in addition to those for whose expulsion authority already existed, should upon warrant be taken into custody and deported as provided by law, "if the Secretary of Labor, after hearing, finds that such aliens are undesirable residents of the United States." The Supreme Court held the warrant was invalid, on the ground that while the aliens under the warrant were convicted of crimes under such circumstances that the Secretary without more might have found them undesirable as residents, the warrant of deportation made no such express finding. In this connection, the Supreme Court said:

" * * * There is no authority given to the Secretary to deport except upon his finding after a hearing that the petitioners were undesirable residents. There is no evidence that he made such a finding except what is found in the warrant of deportation. The warrants recite that upon the evidence the Secretary has become satisfied that the petitioner aliens have been found in the United States in violation of the Act of May 10, 1920, and that they were finally convicted of the offenses named in the act. They could not have been found in the United States in violation of the Act of 1920 until after the Secretary had found that they were undesirable residents. * * *

"Does this omission invalidate the warrant? The finding is made a condition precedent to deportation by the statute. It is essential that, where an executive is exercising delegated legislative power, he should substantially comply with all the statutory requirements in its exercise and that, if his making a finding is a condition precedent to this act, the fulfillment of that condition should appear in the record of the act. [264 U.S. pp. 43, 44, 44 S.Ct. pp. 287, 288.]

In Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, the authority delegated to the President under section 9(c) of Title 1 of the National Industrial Recovery Act was challenged.

Subsidiary to the main objection of unconstitutionality, the Supreme Court found the executive order defective, because it contained no finding or statement of grounds for the order. Pertinent to our inquiry here, the United States Supreme Court, citing Wichita R. R. & Light Co., supra, and Mahler, supra, stated:

"  *  *  *  If it could be said that from the four corners of the statute any possible inference could be drawn of particular circumstances or conditions which were to govern the exercise of the authority conferred, the President could not act validly without having regard to those circumstances and conditions. And findings by him as to the existence of the required basis of his action would be necessary to sustain that action, for otherwise the case would still be one of an unfettered discretion as the qualification of authority would be ineffectual. The point is pertinent in relation to the first section of the National Industrial Recovery Act. We have said that the first section is but a general introduction, that it declares no policy and defines no standard with respect to the transportation which is the subject of § 9(c). But if from the extremely broad description contained in that section and the widely different matters to which the section refers, it were possible to derive a statement of prerequisites to the President's action under § 9(c), it would still be necessary for the President to comply with those conditions and to show that compliance as the ground of his prohibition. To hold that he is free to select as he chooses from the many and various objects generally described in the first section, and then to act without making any finding with respect to any object that he does select, and the circumstances properly related to that object, would be in effect to make the conditions inoperative and to invest him with an uncontrolled legislative power.

"We are not dealing with action which, appropriately belonging to the executive province, is not the subject of judicial review, or with the presumptions attaching to executive action. To repeat, we are concerned with the question of the delegation of legislative power. If the citizen is to be punished for the crime of violating a legislative order of an executive officer, or of a board or commission, due process of law requires that it shall appear that the order is within the authority of the officer, board or commission, and, if that authority depends on determinations of fact, those determinations must be shown." [293 U.S. pp. 431, 432, 55 S.Ct. p. 253.]

Although Justice Cardozo dissented, he expressly supported the holding in the Wichita and Mahler cases, cited in the prevailing opinion, in the following language:

"  *  *  *  One dealt with a delegation to a public utilities commission of the power to reduce existing rates if they were found to be unreasonable; the other a delegation to the Secretary of Labor of the power to deport aliens found after notice and a hearing to be undesirable residents. In each it was a specific requirement of the statute that the basic fact conditioning action by the administrative agency be stated in a finding and stated there expressly. If legislative power is delegated subject to a condition, it is a requirement of constitutional government that the condition be fulfilled. In default of such fulfillment, there is in truth no delegation, and hence no official action, but only the vain show of it. The analogy is remote between power so conditioned and that in controversy here." [293 U.S. pp. 447, 448, 55 S.Ct. pp. 259, 260.]

Again, in Yonkers v. United States, 320 U.S. 685, 64 S.Ct. 327, 88 L.Ed.

400, there was agreement in the majority and dissenting opinions that an express finding is imperative where it has been prescribed by Congress.

The 1953 proclamation, 3019, is not in evidence. The proceedings which initiated and led up to that proclamation have been stipulated, but not the findings. Even if proclamation 3019 contained a finding that, at that time, certain peanut "articles" were being imported in such quantities and under such conditions as to threaten the peanut price support program, a finding basic to the quantitative limitation then imposed, it can not be *inferred* that the President made a like finding in 1955, which he did not state, so as to support the tax imposed by proclamation 3095. The 1955 finding, if made, should be stated. Wichita R. R. & Light Co. v. Public Utilities Commission, supra. The finding is prescribed by section 22(d) as well as by section 22(b). Indeed, section 22(d) incorporates, for modification, the same requirement for investigation, report, finding, and declaration required in the case of an original proclamation under (b) of that section.

It should be noted, lest there be any room for misunderstanding, that the requirement laid down by Congress is that the President shall find that the articles are, or are likely to be, imported under such conditions *and* in such quantities, etc. Only the current or probable importation is in the disjunctive. The risk to be found is expressed conjunctively. Finding is required as to actual *or* likely importation under such conditions *and* in such quantities as to give rise to the circumstances under which the delegated power to impose a fee may be exercised.

Turning to the other arguments presented in the briefs filed by counsel, we see no reason to change our opinion as stated in the earlier Best Foods case, supra, namely, that Congress intended that a certain procedure should be followed by the executive when imposing either a tax or a quota, and that a different procedure might be followed when the executive merely modified a tax or a quota that had previously been lawfully

imposed. No arguments have been presented, or precedents cited, that move us to change that view of the intention which Congress expressed as to the respective procedures to be followed.

However, since our earlier decision was handed down, our appeals court has held that actual participation of a plaintiff in an antidumping investigation bars that plaintiff from complaining that notice of the hearing was not sufficiently given. United States v. Elof Hansson, Inc., 296 F.2d 779, 48 CCPA 91, C.A.D. 771, certiorari denied, Elof Hansson, Inc. v. United States, 368 U.S. 899, 82 S.Ct. 179, 7 L.Ed.2d 95.

Whether, then, this plaintiff, by its conceded participation in the hearing, is barred from complaining that the procedure followed was not the correct procedure for imposition of a fee, or tax, or duty, or is barred only from complaining that the notice given was not a sufficient notice, it is unnecessary for us to decide, in view of our opinion that the findings required of the executive were not made in the proclamation that imposed the duty. It is difficult to conclude that a duty might be validly laid on an importer who attended a Tariff Commission hearing and invalidly laid on other importers of like merchandise who were absent from the hearing. The principle that taxation should be uniform in its application to a class might be strained by such classification.

For the reasons stated, the protest is sustained. Judgment will be entered accordingly.

JOHNSON, Judge (concurring).

I am in accord that the protest herein should be sustained.

The grounds for this court's decision in the previous case (The Best Foods, Inc. v. United States, 39 Cust. Ct. 305, C.D.1945, affirmed on rehearing, 42 Cust. Ct. 310, Abstract 62865) are applicable to the present situation. We there held that the word "modify" connotes a limitation of that which is modified and that the President, under the authority given him by section 22(d) of the Agricultural Ad-

justment Act, could not "modify" a proclamation fixing a quota by changing the quota and adding a fee. The court of appeals affirmed our decision, but on the ground that the President may impose a quota *or* a fee, but not both. United States v. Best Foods, Inc., 47 CCPA 163, C.A.D. 751. That holding strengthens our view that the substitution of a fee for a quota or *vice versa* is a major change, a different burden, and not a modification.

The procedure under which the President may initially levy a fee or fix a quota is found in section 22(a) and (b) of said act, whereas the procedure by which the President may modify a previously imposed fee or quota is found in section 22(d). In the instant case, the latter procedure was followed rather than the former, although the resultant proclamation placed a different burden on the importation of peanuts, rather than modifying a previous one. The significance of the different procedural requirements is brought out in plaintiff's brief, as follows:

> "The procedural requirements that were ignored were not matters of mere protocol or empty formality. They embodied a Congressional determination that the initiative in this field is lodged in joint action of the Secretary of Agriculture and the President since the field affects the integration of the complex programs of the Department of Agriculture, which the Secretary is charged to administer, with the President's administration of the import aspect of foreign affairs. Under the statutory scheme, the rule of the Tariff Commission is purely advisory and factual; it does not involve a policy element such as is involved in initiating action that cuts across two distinct areas of governmental operation."

The powers of the President under the Agricultural Adjustment Act are delegated powers and must be exercised in accordance with the procedures and limitations provided by Congress. Compliance therewith is necessary to give validity to the President's action. Panama Refining Co. v. Ryan, 293 U.S. 388, 432, 55 S.Ct. 241, 79 L.Ed. 446; United States v. Schmidt Pritchard & Co., Mangano Cycles Co., 47 CCPA 152, C.A.D. 750, certiorari denied, 364 U.S. 919, 81 S.Ct. 283, 5 L.Ed.2d 259; Hampton, Jr., & Co. v. United States, 14 Ct.Cust.App. 350, 369, T.D. 42030, affirmed 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624.

United States v. Elof Hansson, Inc., 296 F.2d 799, 48 CCPA 91, C.A.D. 771, is not controlling. In that case, an antidumping investigation was commenced without publication of a notice in the Federal Register, such as is required by the Administrative Procedure Act (5 U.S.C. § 1001, 60 Stat. 237) in connection with "rule making" proceedings. Plaintiff had knowledge of the investigation and actively participated. It was held that plaintiff had waived any procedural irregularities by taking part in the proceedings without timely objection.

In the instant case, a whole line of procedure required by a statute specifically applicable to the situation was not followed. The proceedings were not initiated by the Secretary of Agriculture and the investigation did not result from a communication from the Secretary to the President and from the President to the Tariff Commission. This is an entirely different matter from the failure to publish a notice where actual notice has been given to the interested parties, as in the Elof Hansson case. Here, the procedures set out in section 22(a) and (b) of the applicable statute are conditions precedent to the imposition of a fee, and the failure to observe them renders the action taken *ultra vires* and of no effect. William A. Foster & Co. (Inc.) et al. v. United States, 20 CCPA 15, 20, T.D. 45673; Carl Zeiss, Inc. v. United States, 76 F.2d 412, 23 CCPA 7, T.D. 47654.

Furthermore, under section 22 of the Agricultural Adjustment Act, a fee or a quota could be imposed only if, without it, articles were practically certain to be imported under such conditions and in

such quantities as to render ineffective or interfere with the price support program. No finding was made in the proclamation before us that this was true at that time. In fact, the whole tenor of the investigation and the proclamation is to the effect that there was a deficit in the domestic supply of peanuts and more were needed to meet the essential requirements of domestic peanut users. Since the situation was one where there was a need for more peanuts, it cannot be assumed, in the absence of a positive finding, that without a fee peanuts would be imported in such quantities as to constitute a threat to the price support program. On the contrary, where merchandise is in short supply, prices generally rise. Under such circumstances, the language of the proclamation that—

> " * * * the admission of such additional quantity of peanuts under the conditions and subject to the fee hereinafter proclaimed is necessary in order that the entry of such peanuts will not render or tend to render ineffective, or materially interfere with, the said program of the Department of Agriculture with respect to peanuts, or reduce substantially the amount of any product processed in the United States from peanuts with respect to which such program is being undertaken:

is not equivalent to the positive finding required by the statute that peanuts were practically certain to be imported under such conditions and in such quantities as to interfere with the price support program. Had the facts warranted, it would have been easy for the proclamation to state that if the quota were lifted, peanuts would be certain to be imported under such conditions and in such quantities as to interfere with the price support program and that the imposition of a fee was necessary to prevent this. The original proclamation providing for a quota on the importation of peanuts is couched in precisely such language. Here, on the other hand, a negative position, that the entry of peanuts subject to a fee would not interfere with the

program, was taken without first sustaining the positive burden of demonstrating the necessity for any restriction.

Since, under the statute, certain findings are a condition precedent to the imposition of a quota or a fee, Congress meant those findings to be clear and precise so that the quota or fee would not be placed on importations, unless the situation warranted. This case demonstrates the wisdom of the prerequisite, since it is at least doubtful from the wording of the proclamation itself that the circumstances were such as to necessitate the imposition of a fee when it was stated that additional peanuts were needed to meet essential requirements of domestic users.

For the reasons stated, I concur in holding that the protest be sustained.

RICHARDSON, Judge (dissenting).

The Court of Customs and Patent Appeals, in the case of United States v. Best Foods, Inc., 47 CCPA 163, C.A.D. 751, having decided that the President did not have the power under the statute, 7 U.S.C.A. § 624(b) and (c) (sec. 22(b) and (c) of the Agricultural Adjustment Act), to impose both a quota *and* a fee in proclamation No. 3084, permitting the entry of additional quantities of peanuts, did not reach several other issues ruled upon by the third division of the United States Customs Court in The Best Foods, Inc. v. United States, 42 Cust.Ct. 310, Abstract 62865. These unresolved issues, which have also been raised in this case with respect to proclamation 3095, are:

(1) The adequacy of notice of an investigation to determine whether an existing Presidential proclamation should be modified.

(2) The proper compliance with procedural requirements of section 22 of the Agricultural Adjustment Act, as amended, before issuance of a Presidential proclamation, pursuant to the act, and

(3) Whether the imposition of a fee is a proper modification of an existing proclamation which provides only for a quota.

With respect to these three issues, I reaffirm my views expressed in the dissenting opinion in The Best Foods, Inc. v. United States, Abstract 62865, 42 Cust. Ct. 310, 316.

(1) The plaintiff contends that the fee provision of the proclamation of May 16, 1955, is void, in that the notice of supplemental investigation and public hearing issued by the Tariff Commission on April 1, 1955, and published April 5, 1955, 20 F.R. 2143, did not mention that imposition of a fee would be considered, citing the case of Carl Zeiss, Inc. v. United States, 76 F.2d 412, 23 CCPA 7, T.D. 47654.

The subject of the imposition of fees developed at the hearings and was deemed necessary by the Tariff Commission to effectuate the purposes of section 22, one of which was to avoid interference with the peanut program of the Department of Agriculture. To say that since the public notice did not state that fees were to be considered as a condition to be imposed upon entering or withdrawing imported peanuts from a warehouse for consumption, the Tariff Commission could not consider fees, is to say that the Tariff Commissioners must first determine whether a quota or fee is feasible before they conduct their investigation, which ostensibly is to aid them in determining this matter. The Zeiss case is distinguishable from the case at bar. In the Zeiss case, the Tariff Commission was limited to the consideration of particular merchandise by a specific directive to the Commission contained in Senate Resolution 227, see Congressional Record, volume 75, part II, page 12550, to investigate "the differences in the cost of production between the domestic articles and the foreign articles, and to report, at the earliest practicable date, upon the following articles:

"2. Optical instruments of a class or type *used* by the Army, Navy, or Air Force for fire control and parts thereof." [Emphasis added.]

The complainant received the notice of the Tariff Commission and did not attend the hearing, because it was not interested in the merchandise scheduled for consideration according to the notice. However, the Commission considered merchandise different from that in its notice and merchandise that complainant was interested in. In this case, the merchandise considered at the hearing by the Tariff Commission was the merchandise described in the Commission's notice which the complainant received and it was present and participated in the hearing through its Mr. A. S. Yohalem. Also, the notice set forth the substance of Presidential Proclamation No. 3019, which imposed a quota, and of Supplemental Proclamation No. 3084, which raised the quota and imposed *an additional import fee of 2 cents per pound.*

The fact that the complainant was present and participated in the hearings before the Tariff Commission, through its representative, without his making timely objection at the administrative level that the notice of the hearing was insufficient or inadequate, is, in effect, a waiver of its right to rely upon an alleged procedural irregularity. United States v. Elof Hansson, Inc., 296 F.2d 779, 48 CCPA 91, C.A.D. 771; certiorari denied, Elof Hansson, Inc. v. United States, 368 U.S. 899, 82 S.Ct. 179, 7 L.Ed.2d 95; United States v. Tucker Truck Lines, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54.

(2) The procedure followed by the President in issuing proclamation 3095 was in compliance with the authority conferred upon him by section 22 of the Agricultural Adjustment Act, as amended. The act does not require that the Tariff Commission or the President make an express finding as to parity. The President, on the basis of the finding and recommendation of the Tariff Commission, found that "*the admission* of such additional quantity *of peanuts * * * subject to the fee* hereinafter proclaimed *is necessary in order that the entry* of such peanuts *will not* render or tend to render ineffective, or *materially interfere with the said [domestic] program* of the Department of Agriculture with respect to peanuts, or reduce substantially the amount of any product processed in the

United States from peanuts with respect to which such program is being undertaken \* \* \*." [Emphasis added.] This language from the President's finding is almost verbatim with that found in section 22 and is sufficient to embrace a determination that the price of peanuts would not be maintained above parity level, as parity is a part of the domestic program of the Department of Agriculture. It is immaterial whether the President used the above-quoted language of his finding expressed in his proclamation or whether he expressed his finding in the language which the majority opinion feels was required before proclaiming a fee—that is, that "the importations of shelled peanuts [are] such as to threaten, or as likely to threaten, the price support program of the Agricultural Adjustment Act, directly or by limiting domestic processing of the price supported commodity." Either language would constitute compliance with the requirements of the statute as to the necessary findings by the President at the time of the issuance of his proclamation modifying his earlier proclamation, by eliminating a quota and imposing a fee. The President is not required to use any special combination of words or fixed verbal formula to indicate his finding, as long as he uses language that will meet the policy of Congress expressed in the statute. Also, there is nothing before the court to indicate the "purpose" of the proclamation was to maintain prices to farmers above the level declared to be the policy of Congress.

This court may not go behind the report of the findings of an administrative agency (the Tariff Commission or the President).

"An investigation is a prerequisite to the issuance of a proclamation by the President. William A. Foster & Co. v. United States, 20 C.C.P.A. (Customs) 15, T.D. 45673. However, when it is once established that such an investigation has been had, it is not within the power of this court to go behind the report and findings of the commission and to determine whether, in fact, the proceedings of the commission, and the evidence heard before it, was sufficient to justify the findings and conclusions arrived at. [Union Fork & Hoe Co. v. United States, 24 CCPA 199, 205, T.D. 48656. See also, Westergaard Berg-Johnsen Co. v. United States, 27 CCPA 207, 216, C.A.D. 86.]"

(3) The majority is of the opinion that the word "modify" connotes a limitation of that which is modified and that the President, under the authority given him by section 22(d) of the Agricultural Adjustment Act, could not "modify" a proclamation fixing a quota by eliminating the quota and imposing a fee.

In view of the various judicial definitions indicating the contrary, I do not feel that the word "modify" *necessarily* connotes a limitation. The term is said to have many meanings and is to be interpreted "in the light of the context in which it is used." (58 C.J.S. Modify, p. 840.) It is true that the lexicographers, in some instances, define modify as meaning to reduce rather than to increase the thing modified, but the cases are numerous in which the courts, in interpreting the term, have not adhered to this restrictive meaning. A few citations will serve to illustrate the point.

In the case of Jarman v. Collins-Hill Lumber & Coal Co., 226 Iowa 1247, 286 N.W. 526, the power given to a commissioner to modify a workmen's compensation award was said to be "the power to change, the power to *increase* as well as reduce, the arbitration award." [Emphasis supplied.] Statutory authority of a district court to modify tax assessments on appeal, was held to authorize the court to *increase* as well as decrease the assessment, although statutory notice was not given in McGoldrick Lumber Co. v. Benewah County et al., 54 Idaho 704, 35 P.2d 659. In Evans v. Henson, 73 Ga.App. 494, 37 S.E.2d 164, an addition of sweetened, condensed milk to other items which plaintiff was allowed to sell under provisions of a written contract to serve as salesman for defendant, for which plaintiff was to receive a commission of only

3 per centum, together with addition of other territory to that specified in a written contract in which plaintiff was allowed to sell goods and receive commissions on his sales therein, was held effective as a "modification" of the written contract. In Black's Law Dictionary, 4th edition, the word "modification" is defined as "a change; an alteration which introduces new elements into the details, or cancels some of them, but leaves the general purpose and effect of the subject-matter intact." And the meaning given the word "modify" in the same dictionary, is "to alter; to change in incidental or subordinate features; enlarge, extend; limit, reduce." Accord, In Re Independent Consol. School Dist. No. 16, 241 Minn. 454, 63 N.W.2d 543. The court, in The Best Foods, Inc., case, supra, quoted from Webster's New International Dictionary, second edition, as follows:

> "**Modify** * * * 2. To reduce in extent or degree; to moderate; qualify; lower; as, to *modify* heat, pain, punishment. * * * 4. To change somewhat the form or qualities of; to alter somewhat; as, to *modify the terms of a contract.* * * *" [Emphasis supplied, except for word "modify."]

In the Evans v. Henson case, supra, a sales *contract* was modified by adding thereto *an entirely new product* and *additional territory.* Thus, it appears that even the lexicographic definition above quoted is broad enough to embrace the introduction of *new elements* into the thing being modified, since it uses the modification of a contract as an example to illustrate the definition given.

In the case of State Airlines, Inc. v. Civil Aeronautics Board, 84 U.S.App.D.C. 374, 174 F.2d 510 (reversed in Civil Aeronautics Board v. State Airlines, Inc., 338 U.S. 572, 70 S.Ct. 379, 94 L.Ed. 353), cited in The Best Foods, Inc., case, supra, the United States Court of Appeals for the District of Columbia, in a two-to-one decision, reversed an order of the Civil Aeronautics Board awarding to Piedmont Aviation, Inc., a certificate of convenience and necessity to engage in air transporta-tion along routes which were said to have differed greatly from those sought by Piedmont. In applying for the routes, the applicant inserted in its application a so-called "catch-all clause" seeking the authority to transport along "the routes detailed herein, or such modification of such routes as the Board may find public convenience and necessity require." The Civil Aeronautics Act empowered the board to issue certificates "authorizing the whole or any part of the transportation covered by the application, if it finds that the applicant is fit, willing, and able to perform such transportation properly." The United States Supreme Court, in Civil Aeronautics Board v. State Airlines, supra, said, "The Court of Appeals read this language as showing a congressional purpose to bar the Board from granting any certificates in which the routes awarded deviate more than slightly from the precise routes defined in the application." In the light of this interpretation of the statutory provision, the Court of Appeals viewed the application filed by Piedmont and the routes awarded to it by the board, and, since the latter deviated greatly from the routes specifically requested by the applicant, concluded that Piedmont had not applied for the routes awarded or, in other words, that Piedmont's application did not cover the routes awarded to it. It seems apparent that the meaning of slight alteration, toning down, and limiting, given to the term "modification" by the Court of Appeals, in applying the term to the action of the board, was *directly influenced by its interpretation of the language of the statute set out above.* The only authorities relied on by the Court of Appeals for the restrictive meaning attributed to the term were a definition from volume VI of the Oxford English Dictionary (1933 edition), and a judicial interpretation of the word "modify," as it was used in connection with certain divorce proceedings in the case of Linn v. Linn, 242 Ala. 688, 8 So.2d 187. In the Linn case, the Supreme Court of Alabama, acting under a statute authorizing an appeal from an order *modifying* a divorce decree, dis-

missed the appeal where the lower court had *set aside* the divorce decree. It must be assumed that the Court of Appeals was familiar with the various judicial constructions placed upon the terms "modify" and "modification" and that the definition adopted was selected because it accorded with the interpretation that the court felt the factual situation of the case required, a situation entirely different from that in the instant case.

Although the Supreme Court, in reversing the Court of Appeals, did not discuss the meaning of the term "modification," it stated, in its opinion, 338 U.S. at page 575, 70 S.Ct. at page 381, "We hold that Piedmont's applications were sufficient to permit certification of Piedmont for the routes awarded," and this statement, in our opinion, appears to negative, if indirectly, the finding of the Court of Appeals that the routes awarded Piedmont could not be considered a modification of the routes sought.

In the light of the foregoing cases and the many other cases defining "modify" and "modification," the interpretation given the term "modify" in The Best Foods, Inc. v. United States, supra, is not required. The President could modify his proclamation within the four corners of section 22(d) and the part of section 22(b) which it incorporates by reference (7 U.S.C. § 624(d)), and this included the imposition of a fee provided for in the section, even though the imposition of the fee was the addition of *a new element*. The imposition of a fee changed the mode in which the subject of proclamation 3019 (importation of peanuts) was dealt with, but did not change the subject itself, and this, too, has been said to constitute a modification. (58 C.J.S. Modify, p. 840.) Therefore, I am of the opinion that the term "modify" is broad enough to embrace the imposition of a fee in the modifying proclamation, where only a quota had been proclaimed in the original proclamation. In modifying his original proclamation, the President could impose any condition which was open to him when he issued the original proclamation.

The Tariff Commission recommended that shelled peanuts be permitted to be entered, or withdrawn from warehouse, for consumption "unrestricted by quota," but subject to a fee of 2 cents per pound (plaintiff's exhibit C). Following this recommendation, the proclamation permits "an *unlimited* [italics supplied] additional quantity of peanuts, shelled * * to be entered, or withdrawn from warehouse, for consumption on or before July 31, 1955, subject to a fee of 2 cents per pound, but not more than 50 per centum *ad valorem* * * *." Since the proclamation applied the fee to the period May 19, 1955, to July 31, 1955, the plaintiff contends the establishment of a terminal date amounted to the imposition of a quantitative restriction. If we accept this contention, then, all proclamations imposing a fee must contain an open end to be legal. The terminal date when entries or withdrawals may be made in any proclamation must necessarily, to some degree, influence the amount of the merchandise to be imported, but this should not be interpreted as constituting the imposition of a quota or tantamount to a definite limitation of amount.